UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PRAKASH MOHANTY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AVID TECHNOLOGY, INC., LOUIS HERNANDEZ, JR, and ILAN SIDI,<br><br>Defendants. | ) | Case No.<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Prakash Mohanty ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Avid Technology, Inc. ("Avid" or the "Company"), as well as media and analyst reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of the common stock of Avid between August 4, 2016 and November 9, 2016, inclusive (the "Class Period") seeking remedies pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants include Avid, its Chairman of the Board/President/Chief Executive Officer ("CEO") and its Interim Chief Financial Officer ("CFO") (collectively, "Defendants").

2. Defendant Avid, based in Burlington, Massachusetts, markets digital audio and video editing software used in the film, music, recording, television, concert, and news industries.

3. Until 2016, the Company's hardware and software product offerings were bundled into four suites, all built upon Avid's MediaCentral Platform. The four suites encompassed both audio and video products and solutions.

4. Sales of Avid's complex enterprise systems have always had very elongated sales cycles due to the systems having to be developed and tailored for individual customers, but this gives Avid's management strong visibility into bookings and sales revenues in process.

5. In April 2016 at the National Association of Broadcasters conference, Avid announced its new NEXIS solution product offerings, the media industry's first and only software defined storage platforms, earning the Best of Show award. The Nexis storage product line would come in two general sizes: (i) the Nexis Pro systems designed for moderate-sized post houses and broadcasters; and (ii) the Nexis Enterprise systems, E-2, E-4, and E-5, that could be scaled up to hundreds of clients accessing up to 1.4 Petabytes and more of 4K media. Each had the same underlying architecture, but were designed for their different markets. The Company initially launched only the smaller, non-enterprise version of the Nexis in early May 2016.

6. Meanwhile, on April 13, 2016, Avid disclosed that its longtime CFO John W. Frederick ("Frederick") had suddenly and unexpectedly "resigned," though stating that Frederick would stay on as a highly-paid advisor through at least September 30, 2016.

7. The Class Period starts on August 3, 2016 when, after the close of trading, Avid announced its second quarter 2016 financial results for the period ended June 30, 2016 ("2Q16") and increased its fiscal 2016 ("FY16") financial guidance for the fiscal year ended December 31, 2016. Defendants emphasized that Avid's 2Q16 revenue had increased more than 22% year-over-year driven by ongoing "***recurring revenue growth***." Lauding "the progress [Avid was] making to transform [the] company into a service-platform business with strong positions in higher-growth categories and ***a greater proportion of recurring revenue***," Defendants increased the upper end of Avid's bookings guidance for the third quarter 2016 ("3Q16") from $115 million to $120 million and increased the upper end of its 3Q16 revenue guidance from $120 million to $135 million. Defendants also increased the upper end of Avid's previously-issued FY16 bookings guidance from $536 million to $566 million and the upper end of its FY16 revenue guidance from $525 million to $565 million.

8. On this news, the price of Avid common stock spiraled upward, increasing more than 8% on August 4, 2016 alone on unusually high trading volume of almost 2.4 million shares trading, more than nine times the average trading volume over the preceding ten trading days. The price of Avid common stock continued climbing on Defendants' strong statements and product announcements during the Class Period, reaching a Class Period high of $9.78 per share in intraday trading by August 22, 2016.

9. Meanwhile, unbeknownst to investors, during the 3Q16 ending on September 30, 2016, some of Avid's enterprise clients had been deferring certain upgrades of renewals and purchases of Avid's existing products as they waited for the release of the enterprise class features of the NEXIS offerings.

10. On November 9, 2016, after the close of trading, Avid suddenly disclosed that both its 3Q16 bookings and revenues had come in considerably lower than the Company had led the investment community to expect, blaming "the transition of the storage product line" and disclosing that "some existing enterprise clients deferred normal upgrade and renewal decisions and new customers postponed investments until the release of functionality targeted to the enterprise market." During the conference call held that day, Avid's CEO further elaborated stating that "[t]he excitement over the new NEXIS storage line initially launched for the non-enterprise market ***essentially ha[d] frozen the enterprise market*** as they deferred normal upgrades and renewals of the existing storage products until the enterprise level features were delivered for NEXIS," adding that "[t]hese enterprise level features were delivered in Q3 as expected," "[h]owever, ongoing storage upgrade renewal had already been deferred." During the call, Avid's CEO expressly admitted that the enterprise product deferrals pending the release of the enterprise Nexis products was precisely "what we had expected to happen." As a result, Avid slashed the upper end of its FY16 bookings

guidance down to $445 million (from $566 million) and the upper end of its FY16 revenue guidance down to $517 million (from $565 million), blaming the aforementioned storage product transition and "continued volatility in the enterprise market."

11. On this news, the Company's stock price plummeted 28% on November 10, 2016 unusually high trading volume of more than 5 million shares trading, more than twelve times the average daily trading volume over the preceding ten trading days.

12. The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a) that because Avid had not launched all the enterprise level features for NEXIS, its enterprise customers were deferring renewals and purchases; and

(b) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Avid's business, operations, earnings, and financial prospects during the Class Period.

13. As a result of Defendants' false statements, Avid's stock traded at inflated levels during the Class Period. However, after the above revelations were disclosed to the market, the Company's shares were hammered by massive sales, sending them down more than 53% from their Class Period high—***or more than $5 per share***—and approximately ***$213 million*** in market capitalization simply vanished.

**JURISDICTION AND VENUE**

14. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Jurisdiction is conferred by § 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this district pursuant to § 27 of the Exchange Act. Avid is headquartered in this District and the acts and transactions giving rise to the violations of law complained of occurred in this District.

**THE PARTIES**

16. Plaintiff, Prakash Mohanty, purchased Avid common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

17. Defendant Avid is headquartered in Burlington, Massachusetts. During the Class Period, Avid had more than 40 million shares of common stock outstanding, which shares traded in an efficient market on the NASDAQ under the ticker symbol "AVID." Avid was followed by scores of stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor and analyst conferences. Avid also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.

18. Defendant Louis Hernandez, Jr. ("Hernandez") is, and was at all relevant times, Avid's President, CEO, and Chairman of its Board of Directors.

19. Defendant Ilan Sidi ("Sidi") is, and has been at all relevant times, Avid's Interim CFO and Vice President of Human Resources.

20. Defendants Hernandez and Sidi are sometimes referred to herein as the "Individual Defendants."

21. During the Class Period, the Individual Defendants ran Avid as "hands-on" managers overseeing Avid's operations and finances and made the material false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of Avid's financial and business operations, as they received daily reports and had access to

computerized information regarding sales, costs and expenses, product demand, inventory management, and the conditions surrounding the NEXIS launch. They were also intimately involved in deciding which disclosures would be made by Avid. Indeed, the Individual Defendants made various public statements for Avid during the Class Period, and participated in all Class Period investor conferences. Hernandez and Sidi also signed Avid's filings with the SEC during the Class Period, including certificates filed pursuant to the Sarbanes Oxley Act of 2002 stating the financial reports were accurate.

**BACKGROUND TO THE CLASS PERIOD**

22. Avid provides an open, integrated, and comprehensive technology platform, along with applications and services that enable the creation, distribution, and monetization of audio and video content. Specifically, it develops, markets, sells, and supports software and hardware for digital media content production, management, and distribution. Digital media are video, audio or graphic elements in which the image, sound or picture is recorded and stored as digital values, as opposed to analog or tape-based signals. Avid's products are used in production and post-production facilities; film studios; network, affiliate, independent, and cable television stations; recording studios; live-sound performance venues; advertising agencies; government and educational institutions; corporate communication departments; and by independent video and audio creative professionals, as well as aspiring professionals. Projects produced using Avid's products include feature films, television programming, live events, news broadcasts, commercials, music, video, and other digital media content.

23. In 2014 Avid began offering subscription based licensing options for some of its products and solutions. These licensing options offer choice in pricing and deployment to suit its customers' needs and were expected to increase recurring revenue on a longer-term basis.

24. Prior to 2016, Avid had organized its existing hardware and software products and introduced new solutions in four suites, all built upon Avid's MediaCentral Platform. These four suites encompass both audio and video products and solutions and are summarized below:

- ***Artist Suite*** encompassed all of Avid's products and tools used to create content, including video editing solutions, digital audio workstations (DAW), music notation software, control surfaces, and live sound systems. Products and tools in the Artist Suite could be deployed on premise, cloud-enabled, or through a hybrid approach. Users could collaborate to access, edit, and share the same media; and collaborate with others as if they were all in the same facility.
- ***Media Suite*** included all of Avid's tools and services used to manage, protect, distribute, and monetize media, including solutions for newsroom management, asset management, and multiplatform distribution.
- ***Studio Suite*** comprised of in-studio tools for on-air program and viewership enhancement, including 3D real-time graphics, replay servers, and sports enhancements.
- ***Storage Suite*** referred to all of Avid's products and tools used to capture, store, and deliver media, including online storage, nearline storage, and ingest/playout servers. These products and tools worked in close concert with the Media Suite's tagging and asset management.

25. In April 2016 at the National Association of Broadcasters conference, Avid announced its new NEXIS solution product offerings, the media industry's first and only software defined storage platforms, earning the Best of Show award. The NEXIS storage product line would come in two general sizes: (i) the NEXIS Pro systems designed for moderate-sized post houses and broadcasters; and (ii) the NEXIS Enterprise systems, E-2, E-4 and E-5, that could be scaled up to hundreds of clients accessing up to 1.4 Petabytes and more of 4K media. Each had the same underlying architecture, but were designed for their different markets. The Company initially launched only the smaller, non-enterprise version of the NEXIS in early May 2016.

26. Meanwhile, on April 13, 2016, Avid disclosed that its longtime CFO Frederick had suddenly and unexpectedly "resigned," though Frederick would stay on as a highly-paid advisor through at least September 30, 2016.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

27. The Class Period commences on August 4, 2016. On the prior evening, after the close of trading on April 3, 2016, Avid issued a press release announcing its 2Q16 financial results for the period ended June 30, 2016, emphasizing in its headline that Avid had "Met or Exceeded Guidance for All Metrics." In addition to reporting that "Bookings were $102.2 million, in line with guidance and up 10.5% quarter-over-quarter, and as expected down 13.1% year-over-year," and that "GAAP Revenue was $134.1 million, up 22.1% year-over-year; non-GAAP Revenue was $134.4 million, above the guidance range and up 22.4% year-over-year,"[1] the release quoted Defendant Hernandez stating in pertinent part as follows:

> "We delivered bookings, adjusted free cash flow and non-GAAP operating expenses in line with guidance, and non-GAAP revenue and adjusted EBITDA above the guidance range," said Louis Hernandez, Jr, Chairman, President, and CEO of Avid. "***Performance was driven by recurring revenue growth as well as improved conversion of bookings and revenue backlog to revenue, partly driven by new software releases***. We also benefitted from tight cost control and low material costs. ***We continue to build on the momentum of Avid Everywhere, our strategic vision for the industry, with the number of users of the Media Central platform now surpassing 38,000 as our global customer base embraces the efficiency and flexibility of our platform. We are also encouraged by the continued upward trajectory of our Alliance business, which benefits from cross-selling third-party applications into our expanded user base, and our Tier 3 business, focused on independent professionals, which generated double-digit growth in digital bookings and triple-digit growth in cloud-enabled subscriber bookings.***"
>
> "***We are raising our full-year guidance range for non-GAAP revenue*** and adjusted EBITDA. We are also improving our guidance range for non-GAAP operating expenses because we are increasing our annualized run-rate cost savings target to $76 million. We are on track to be cash flow positive for the full year as we continue to execute our efficiency program and growth initiatives. ***We are reaffirming guidance for bookings***, although we expect to be at the lower end of the range, due to higher than expected volatility in the media enterprise market."

---

[1] "GAAP" refers to compliance with Generally Accepted Accounting Principles.

"***Our financial results and operational performance this quarter underscore the progress we are making to transform our company into a service-platform business with strong positions in higher-growth categories and a greater proportion of recurring revenue.*** We have a clear path to complete this transformation by our target of mid-2017, which will enable us to accelerate growth, realize a more efficient cost structure, increase revenue visibility, and generate enhanced value for our shareholders over the long-term," Mr. Hernandez concluded.

28. As to Q316 and FY16 financial guidance, the release stated in pertinent part as follows:

**Financial Guidance**

Q3 2016 Financial Guidance (in millions)

| | |
|---|---|
| Bookings (Constant Currency) | $105-$125 |
| Bookings | $100-$120 |
| Non-GAAP Revenue | $120-$135 |
| Non-GAAP Operating Expenses | $57-$62 |
| Adjusted EBITDA | $21-$29 |
| Adjusted Free Cash Flow | $(8)-$5 |

The Company also updated its full-year 2016 guidance, as originally provided on March 15, 2016. The Company is increasing its full-year guidance for non-GAAP Revenue and Adjusted EBITDA, as a result of higher conversion of bookings and revenue backlog to revenue, partly driven by new software releases, as well as tighter cost control. The Company is also improving its guidance range for non-GAAP Operating Expenses, as a result of increasing the target for its efficiency program to up to $76 million of annualized run-rate cost savings, most of which will be achieved in 2016. The Company is reaffirming its guidance for Adjusted Free Cash Flow and Bookings, but expects to be in the lower end of the range for Bookings due to higher than expected volatility in the media enterprise market.

Full-Year 2016 Financial Guidance (in millions)

| | |
|---|---|
| Bookings (Constant Currency) | $530-$566 |
| Bookings | $500-$536 |
| Non-GAAP Revenue | $535-$565 |
| Non-GAAP Operating Expenses | $247-$260 |
| Adjusted EBITDA | $118-$135 |
| Adjusted Free Cash Flow | $2-$12 |

29. That evening, Individual Defendants Hernandez and Siti held a conference call with investors and stock analysts providing further positive commentary about the Company's business metrics and financial prospects. Defendant Hernandez opened his remarks discussing the Company's strong sales trends, stating in pertinent part as follows:

> I think we've seen pretty strong trends in some of our key growth initiatives. We believe this is signaling the market acceptance of our strategy. The platform strategy continues to resonate and adoption by enterprise users is going in a strong pace of 47% from year-ago. Individuals are now benefiting from our cloud-enabled subscriptions and the subscriber base continues to expand almost quadrupling from a year-ago. We're on track to complete the transformation in mid-2017 as has been the plan since we announced the transformation.

30. Defendant Hernandez went on to emphasize that Avid was "starting to see an increase in enterprise wide agreements which are often large multimillion dollar agreements, and these are often longer sales cycles because they are more strategic, but they result in more strategic relationships."

31. Addressing the ongoing Nexis rollout specifically, Defendant Hernandez went on to state in pertinent part as follows:

> Naturally in the second half of the year will be focused on the rollout of NEXIS the virtualized storage which is up sequentially. ***But we have lots of powerful new features towards the end of second quarter, which is going to open up different categories of the tiers and we believe will accelerate NEXIS.***
>
> . . .
>
> Storage grew sequentially in Q2 and we believe we can further accelerate growth in the second half. ***We needed to release the enhanced features for NEXIS, our virtualized shared storage solution that we delivered in Q2 and now we have award winning storage product and growing pipeline of deals.***

32. During his opening remarks, in addition to reiterating the guidance provided in the release, Defendant Sisi added that Avid "expect[ed] to continue generating strong growth in individual subscription and through Alliances," and "also expect[ed] stronger growth in the second half from key products such as NEXIS, Orad, and Audio products," stating Avid "expect[ed] these

measures to contribute approximately $30 million of incremental cash flow in H2 versus H1 at the midpoint of [Avid's] guidance range."

33. During the conference call held with investors, a stock analyst queried why bookings were "down like $12 million sequentially," stating that "one would have thought that was NEXIS, it would have a sequential increase in product bookings, what's going on elsewhere to leave that number down?" Responding to that query, Defendant Hernandez stated that the Company had launched the required enterprise features in the 2Q16, stating in pertinent part as follows:

> ***NEXIS had some key features that needed to be added in Q2 for the large enterprise deployment. You saw a nice increase quarter-over-quarter.***
>
> ***I think you'll see that begin to accelerate as people work through their transition to NEXIS away from ISIS.*** It's more powerful. It's purely software defined. It has a much lower cost to hardware component and it's been independent hardware component which shows the direction we're going and it's cheaper.
>
> ***So we're getting some very strong receptivity once these features came out late in the quarter. I think you'll see that. We expect that to continue to increase. You'll see that product area go up their product line and go up . . . .***

34. Later in the call, another analyst queried "[h]ow much NEXIS revenue we should recognize in the quarter?" to which Defendant Hernandez responded: "We don't break out any individual product, ***but it did increase sequentially***."

35. On this news, the price of Avid common stock increased, closing up more than 8% on August 4, 2016, alone on unusually high trading volume of almost 2.4 million shares trading, more than nine times the average trading volume over the preceding ten trading days. The price of Avid common stock continued climbing on Defendants' strong statements and product announcements during the Class Period, reaching a Class Period high of $9.78 per share in intraday trading by August 22, 2016.

36. On August 26, 2016, Avid issued a press release disclosing that it would "Unveil Latest Innovations and New Products at IBC 2016," a "premier annual event for professionals

engaged in the creation, management and delivery of entertainment and news content worldwide tak[ing] place on September 9-13 in Amsterdam." The release further stated that "[n]ew product additions and major updates for the Avid NEXIS™ family, the industry's first and only software-defined storage platform specifically designed for storing and managing media."

37. On September 9, 2016, Avid issued a release concerning its presentation at IBC 2016 stating in pertinent part that "[n]ew high-density, high-availability Avid NEXIS solutions enable large-scale broadcast and post-production organizations to accelerate production and increase efficiency." The release quoted Defendant Hernandez discussing the enterprise NEXIS rollout, stating in pertinent part as follows:

> "Across the industry, we are seeing an unprecedented explosion of content, which drives the need for more robust storage infrastructure, greater reliability and control, and closer collaboration," said Avid Chairman, President and CEO, Louis Hernandez, Jr. "To address these key customer issues, we delivered Avid NEXIS earlier this year, and the adoption from media organizations of all sizes has been incredible. ***Now we are continuing to innovate with new high-density and high-availability Avid NEXIS solutions that help the largest broadcast and post-production organizations to increase operational efficiency and maximize the lifetime value of their assets.***"

38. As to the availability of the new NEXIS enterprise software, the release further stated in pertinent part as follows:

> **Availability**
>
> - Avid NEXIS | E5 is available now
> - Avid NEXIS Redundant Storage Controller option is available now
> - Avid NEXIS Redundant System Director option is available now
> - Avid NEXIS Redundant Networking option will be available in Q4 2016
> - Avid NEXIS Media Mirroring option will be available in Q4 2016

39. Trade journal *Broadcast Bridge* published an article highlighting Avid's presentation at IBC 2016, emphasizing that "Avid's Nexis Pro is a scalable storage system for mid-size facilities,

***but its bigger brother, Avid Nexis Enterprise can handle more than 1.4 Petabytes of storage***." The *Broadcast Bridge* article quoted an Avid senior director of product management further stating in pertinent part as follows:

> "Actually, ***today our Avid Nexis storage product line comes in two general sizes***: the Nexis Pro systems that can be expanded to four engines, ***and the Nexis Enterprise systems, E-2, E-4 and E-5, that we also announced at IBC***," David Colantuoni, senior director of product management at Avid told The Broadcast Bridge. "These can be scaled up to hundreds of clients accessing up to 1.4 Petabytes and more of 4K media. Each have the same underlying architecture, but are designed for different markets."

40. On October 7, 2016, Avid issued a release entitled "Avid Seeing Strong Demand for Avid NEXIS from Customers Globally" which stated in pertinent part as follows:

> BURLINGTON, Mass., Oct. 07, 2016 (GLOBE NEWSWIRE) -- Avid® (AVID) today announced ***significant global adoption of Avid NEXIS™***, the first and only software-defined storage platform specifically designed for storing and managing media. Since its introduction at NAB 2016, ***substantial numbers of production and post-production facilities have implemented Avid NEXIS. Powered by the MediaCentral® Platform, Avid NEXIS delivers dynamic virtualization and media-savvy collaboration, enabling customers to accelerate production and increase efficiency***.
>
> Stop-motion animation studio LAIKA has invested in Avid NEXIS | E4 for its current and future animated feature films. "At LAIKA, we have an uptime environment—meaning we cannot have downtime—with editorial at the heart of production and multiple projects running at the same time," said Trevor Cable, Lead Media Engineer and Editorial Manager at LAIKA. "Avid NEXIS provides us with great media management, unrivaled reliability, and high bandwidth at a competitive price. It was very easy to deploy and it's simple to create users, groups and workspaces. I have complete confidence in Avid NEXIS | E4 and plan on purchasing another for failover redundancy."
>
> Creative post-production house Gorilla Post uses cutting-edge Avid workflows to accelerate production and dramatically enhance collaboration at every step of the creative process — from ingest and editing, to sound design and mixing, to color correction and finishing. The Dublin-based facility recently expanded its workflow to include Avid NEXIS | E2.
>
> "With all of our Avid-centric workflows at Gorilla, Avid NEXIS was an easy choice," said Barry Reid, Managing Director and Owner at Gorilla Post Production. "Our decision was based on the continued reliability we've always experienced with Avid products. The bandwidth is so fast that any edit suite in the facility—be it

offline, grade, mix or finishing suite—can access the large dailies/transcodes from our ingest station with minimal downtime. It's hugely beneficial."

Using Avid NEXIS in a provided-facilities environment for an outside broadcast production, Video Europe deployed Avid NEXIS | E4 at UK music festival, Latitude. "We required a reliable shared storage environment to handle the demands of a fast-turnaround, multi-camera live production," said Ollie Stratton, Engineer at Video Europe. "Working with mixed formats meant the workflow needed to be resilient to handle whatever was thrown at it. The combination of Media Composer® and the Avid NEXIS storage environment was a perfect match for this on-site deployment."

Other companies that have invested in Avid NEXIS include major US television broadcast networks; US basketball team The Miami Heat; Canadian broadcaster CBC; The Church of Jesus Christ of Latter-day Saints; UK independent TV production company Spun Gold; UK full-service post-production house The Edit; Belfast-based production company Paper Owl Films; French television network La Chaine Parlementaire; French sports news channel Infosport+; German broadcaster CBC; Germany's Federal Ministry of Defense; Italian digital satellite television platform Sky Italia; Arabian television channel Discovery Networks MENA; and Doha-based state-funded broadcaster Al Jazeera.

***"Avid NEXIS addresses the unprecedented explosion of content and the need for more robust storage infrastructure, reliability and collaboration," said Jeff Rosica, senior vice president and chief sales & marketing officer at Avid. "With strong adoption across the globe, post-production organizations and broadcasters are reaping the benefits of the industry's first and only software-defined storage platform by accelerating production and increasing efficiency."***

Avid NEXIS enables fully virtualized storage so media organizations can adjust storage capacity mid-project, without disrupting workflows. Customers can select components that meet their current needs, and easily grow as their needs change. Avid NEXIS is the only scale-out storage solution that enables customers to dynamically tune the system to ensure that high-priority workflows always have the capacity, performance and data protection levels they require. Customers can give critical projects maximum performance, while throttling back on less critical workflows. This ability lets teams react quickly to changes, adjusting performance and protection levels to match the needs of a project at any stage in the workflow.

41. The statements referenced above in ¶¶ 27-34 and 36-40 were each materially false and misleading when made, as they failed to disclose and misrepresented the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a) that because Avid had not launched all the enterprise level features for NEXIS, its enterprise customers were deferring renewals and purchases; and

(b) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Avid's business, operations, earnings, and financial prospects during the Class Period.

42. On November 9, 2016, after the close of trading, Avid suddenly disclosed that both its 3Q16 bookings and revenues had come in considerably lower than the Company had led the investment community to expect, blaming "the transition of the storage product line" and disclosing that "some existing enterprise clients deferred normal upgrade and renewal decisions and new customers postponed investments until the release of functionality targeted to the enterprise market." During the conference call held that day, Avid's CEO, Defendant Hernandez, further elaborated, stating that "[t]he excitement over the new NEXIS storage line initially launched for the non-enterprise market ***essentially ha[d] frozen the enterprise market*** as they deferred normal upgrades and renewals of the existing storage products until the enterprise level features were delivered for NEXIS," adding that "[t]hese enterprise level features were delivered in Q3 as expected," "[h]owever, ongoing storage upgrade renewal had already been deferred." During the call, Defendant Hernandez expressly admitted that the enterprise product deferrals pending the release of the enterprise Nexis products was precisely "what we had expected to happen." As a result, Avid slashed the upper end of its FY16 bookings guidance down to $445 million (from $566 million) and the upper end of its FY16 revenue guidance down to $517 million (from $565 million), blaming the aforementioned storage product transition and "continued volatility in the enterprise market."

43. On this news, the Company's stock price plummeted 28% on November 10, 2016, unusually high trading volume of more than 5 million shares trading, more than twelve times the average daily trading volume over the preceding ten trading days.

**NO SAFE HARBOR**

44. Avid's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. § 78u-5(b)(2)(A).

45. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Avid who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**ADDITIONAL SCIENTER ALLEGATIONS**

46. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Avid, their control over, and/or receipt of modification of Avid's allegedly materially misleading misstatements and/or their associations with the Company

which made them privy to confidential proprietary information concerning Avid, participated in the fraudulent scheme alleged herein.

47. Sales of Avid's complex enterprise systems have always had very elongated sales cycles due to the systems having to be developed and tailored for individual customers, giving Avid's management strong visibility into bookings and sales revenues in process.

48. More importantly, Avid's senior executives knew some of enterprise features of Nexis were not made available until during the 3Q16, which was causing certain enterprise customers to defer renewal upgrades and other purchases. During the November 9, 2016 conference call, Avid's CEO, Defendant Hernandez, expressly admitted that the enterprise product deferrals pending the release of the enterprise NEXIS products was precisely "what we had expected to happen."

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE**

49. At all relevant times, the market for Avid's common stock was an efficient market for the following reasons, among others:

(a) Avid's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) The Company had more than 40 million shares outstanding as of November 4, 2016. During the Class Period, on average, 517,406 shares of Avid stock were traded on a daily basis, demonstrating a very active and broad market for Avid stock and permitting a very strong presumption of an efficient market;

(c) Avid claims to be qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d) as a regulated issuer, Avid filed periodic public reports with the SEC;

(e) Avid regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f) Avid was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(g) numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Avid stock at all times during the Class Period; and

(h) unexpected material news about Avid was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

50. As a result of the foregoing, the market for Avid common stock promptly digested current information regarding Avid from publicly available sources and reflected such information in Avid's stock price. Under these circumstances, all purchasers of Avid common stock during the Class Period suffered similar injury through their purchase of Avid common stock at artificially inflated prices, and a presumption of reliance applies.

**LOSS CAUSATION**

51. During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Avid's business fundamentals and engaged in a scheme to deceive the market. Defendants knowingly misstated then present sales trends in order to improve the market's perception of Avid's worth. By artificially inflating and manipulating Avid's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the

truth was revealed. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, causing Avid's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Avid securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

52. This is a class action on behalf of those who purchased or otherwise acquired Avid common stock during the Class Period, excluding Defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

53. Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Avid common stock; and (e) the extent of and appropriate measure of damages.

54. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

55. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

56. Throughout the Class Period, Defendants Avid and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Avid

common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

57. During the Class Period, Defendant Avid and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to, and throughout the Class Period did: (a) artificially inflate and maintain the market price of Avid common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Avid common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants Avid and the Individual Defendants, and each of them, took the actions set forth herein, in violation of § 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58. In addition to the duties of full disclosure imposed on Defendants Avid and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Avid's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. § 210.01, *et seq*.) and S-K (17 C.F.R. § 229.10, *et seq*.).

59. Defendants Avid and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

60. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Avid common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Avid common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Avid and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Avid stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

61. Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Avid and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Avid shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62. By virtue of the foregoing, Defendants Avid and the Individual Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. § 240.10-5.

## COUNT II

### For Violation of § 20(a) of the Exchange Act Against Individual Defendants Hernandez and Sidi

63. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

64. Defendants Hernandez and Sidi had control over Avid and made the material false and misleading statements and omissions on behalf of Avid within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions, board membership (in the case of Defendant Hernandez) and stock ownership, Individual Defendants Hernandez and Siti had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading. The Individual Defendants were all provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

65. By reason of such wrongful conduct, Defendants Hernandez and Siti are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants Hernandez's and Siti's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: November 21, 2016

HUTCHINGS BARSAMIAN
MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109

s/ Theodore M. Hess-Mahan
THEODORE M. HESS-MAHAN

110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: 781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 W Broadway, Suite 1540
San Diego, CA, 92101
Telephone: 619/230-0063
619/255-1856 (fax)
frankj@johnsonandweaver.com

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: 770-200-3104
770/200-3101 (fax)
michaelf@johnsonandweaver.com

*Attorneys for Plaintiff*