UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRAKASH MOHANTY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AVID TECHNOLOGY, INC., LOUIS HERNANDEZ, JR, and ILAN SIDI,<br><br>Defendants. | Case No. 1:16-cv-12336-IT<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | NATURE OF THE ACTION | 1 |
| II. | JURISDICTION AND VENUE | 7 |
| III. | THE PARTIES | 7 |
| IV. | RELEVANT NON-PARTIES | 9 |
| V. | SUBSTANTIVE ALLEGATIONS | 10 |
| | A. Avid's History and Business | 10 |
| | B. The Class Period Begins as the Company Increases Guidance and Trumpets the Positive Impact of NEXIS's Rollout | 17 |
| | C. The Truth Is Revealed | 34 |
| VI. | NO SAFE HARBOR | 37 |
| VII. | ADDITIONAL SCIENTER ALLEGATIONS | 37 |
| VIII. | APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE | 39 |
| IX. | LOSS CAUSATION | 40 |
| X. | CLASS ACTION ALLEGATIONS | 43 |
| XI. | PRAYER FOR RELIEF | 47 |
| XII. | JURY DEMAND | 48 |

Lead Plaintiff David Wayne Hammond ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and based upon the investigation conducted by and through Plaintiff's attorneys, which included a review of United States Securities and Exchange Commission ("SEC") filings by Avid Technology, Inc. ("Avid" or the "Company"), media and analyst reports about the Company, earnings conference call transcripts, news releases and other public statements issued by the Company, and public records related to the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of the common stock of Avid between August 4, 2016 and November 9, 2016, inclusive (the "Class Period"), seeking remedies pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]. Defendants include Avid, Louis Hernandez, Jr. ("Hernandez"), Avid's Chairman of the Board, President, and Chief Executive Officer ("CEO"), and Ilan Sidi ("Sidi"), Avid's Interim Chief Financial Officer ("CFO") (collectively, "Defendants").

2. Avid is based in Burlington, Massachusetts and markets digital audio and video editing software used in the film, music, recording, television, concert, and news industries.

3. On April 16, 2016, Avid announced its new Avid NEXIS™ product offerings ("NEXIS"), described by the Company as the industry's first and only software-defined storage platform specifically designed for storing and managing media. The NEXIS product line would replace the Company's previous "ISIS" shared storage platform offerings.

4. The Company has adopted a platform-based approach built upon its MediaCentral Platform, which includes its NEXIS offerings, as a strategy to create cross sale opportunities and generate long-term growth.

5. Large media enterprises, labeled "Tier 1" customers by Avid, are critical to Avid's platform strategy and, according to the Company's last two annual reports, are the target of Avid's sales efforts. According to Defendant Hernandez, large media enterprises "validate" the Company's platform strategy because once large enterprise clients become Avid platform customers, their relationship with Avid becomes "sticky" and they continue to spend millions with Avid. Indeed, according to Defendant Hernandez, "[t]he platform is the anchor that enables [Avid] to expand business with [Avid's] existing customers and maximize value over time." Given the importance of drawing such customers into Avid's platform, analysts have described the Company's bookings as the "key engine to the story" of Avid's growth potential.

6. Following Avid's announcement of NEXIS, the Company warned investors that the Company's first and second quarter 2016 bookings and revenues would be impacted by delayed buying decisions pending NEXIS's release in the second quarter of 2016 ("2Q16").

7. However, by April 28, 2016, NEXIS had launched, the Company announced it was taking orders, and shipping was expected to begin in 2Q16. Thus, going into the Class Period, there was a focus on whether Avid's large media enterprise customers had in fact only delayed or deferred purchases and bookings pending the release of NEXIS, and whether the Company would now fully realize those delayed or deferred sales in the third quarter of 2016 ("3Q16") and beyond.

8. The Class Period begins on August 4, 2016, over a month into 3Q16. After the close of trading on August 3, 2016, Avid issued a press release announcing the Company's 2Q16

financial results and updating Avid's financial guidance for 3Q16 and fiscal 2016 ("FY16") reporting periods. Defendants increased the upper end of Avid's bookings guidance for 3Q16 from $115 million to $120 million and increased the upper end of its 3Q16 revenue guidance from $120 million to $135 million.

9. Citing "higher conversion of bookings and revenue backlog to revenue, partly driven by new software releases," Defendants also increased the upper end of Avid's previously-issued FY16 bookings guidance from $536 million to $566 million and the upper end of its FY16 revenue guidance from $525 million to $565 million.

10. In the release and subsequent earnings call with analysts, Defendants repeatedly touted the Company's rapidly increasing success with large media enterprise customers. The Company's release praised the Company's "strong pipeline" of large media enterprise deals that was "driving growth." During the call, Defendant Hernandez touted large media enterprises' "strong pace" of adoption of Avid's platforms, citing "an increase in enterprise wide agreements which are often large multimillion dollar agreements" due to "an increase in demand among our Tier 1 [large media enterprise] customers for large enterprise deals . . . ." Defendant Hernandez praised the Company's "rapidly growing large enterprise deal pipeline" while Defendant Sidi touted the Company's "growing pipeline of deals" with large media companies.

11. Unbeknownst to investors, at the time of the August 3, 2016 2Q16 earnings release and conference call, and despite Defendants positive statements, Defendants knew but did not disclose that rather than rapidly adopting NEXIS, large media enterprises—the very target of Avid's sales efforts—had in fact been ***deferring*** renewal purchases of existing products pending the release of NEXIS functionality targeted to the enterprise market, which Defendants knew would not be available until the very end of 3Q16. These large media enterprise deferrals

rendered Defendants' positive statements about the Company's "rapidly growing" large media enterprise business misleading. Defendants also knew these deferrals would materially impact Avid's 3Q16 results, making Defendants' statements concerning its rapidly expanding large media enterprise business false and misleading for omitting any discussion of the large media enterprise deferrals and their inevitable impact on Avid's 3Q16 results.

12. In response to Defendants' positive statements about Avid's rapidly expanding large media enterprise business, and lofty 3Q16 and FY16 projections, the price of Avid common stock spiraled upward more than 8% on August 4, 2016 alone, on unusually high trading volume of almost 2.4 million shares, more than nine times the average trading volume over the preceding ten trading days. The price of Avid common stock continued climbing on Defendants' strong statements, product announcements, and glowing forecast during the Class Period, reaching a Class Period high of $9.78 per share in intraday trading by August 22, 2016.

13. On August 5, 2016, the Company released its quarterly report for 2Q16 on Form 10-Q ("2Q16 Form 10-Q"). Although the 2Q16 Form 10-Q blamed a six-month decrease of $10.9 million in video products and solutions revenues for the first half of 2016, as compared to the first half of 2015, on "delayed purchasing decisions of shared storage solutions by customers anticipating our next-generation shared storage product," the Company's 2Q16 Form 10-Q did not state that such delayed purchases would continue into 3Q16. To the contrary, the increases in 3Q16 and FY16 bookings and revenue guidance conveyed the opposite message to investors.

14. Indeed, even after 3Q16 had ended, Defendants continued to tout Avid's "surging" large media enterprise business without disclosing refusals or deferrals of large media enterprise purchases.

15. Finally, on November 9, 2016, after the close of trading, Defendants finally disclosed that large media enterprises had continued to defer purchases in 3Q16 and that the Company's 3Q16 financial results were far worse than the Company had for months led the investment community to expect. Defendants disclosed that Avid's large media enterprise customers had "deferred normal upgrade and renewal decisions and new customers postponed investments until the release of functionality targeted to the enterprise market." As a result, Avid reported 3Q16 bookings of $89.5 million, over 10% below the floor of Defendants' recently increased guidance of $100 million to $120 million; and revenue of $119 million, below Defendants' recent guidance of $120 million to $135 million. The Company also reduced the upper end of its FY16 bookings guidance down to $445 million (from $566 million) and the upper end of its FY16 revenue guidance down to $517 million (from $565 million).

16. During the conference call held that day, Defendant Hernandez further elaborated, explaining, "[t]he excitement over the new NEXIS storage line initially launched for the non-enterprise market ***essentially ha[d] frozen the enterprise market*** as they deferred normal upgrades and renewals of the existing storage products until the enterprise level features were delivered for NEXIS." Even though NEXIS class enterprise-level features were delivered in September 2016 "as expected," "ongoing storage upgrade renewal ***had already been deferred***." During the call, Defendant Hernandez admitted the large media enterprise deferrals were precisely "***what we had expected to happen***." Moreover, Hernandez also admitted that large enterprise deferrals had been occurring "***for a couple of quarters***"—in other words, the large enterprise deferrals started occurring in 2Q16, well before Defendants touted Avid's rapidly increasing large media enterprise business almost halfway through 3Q16 on August 3, 2016—

and well before the Company inexplicably increased its 3Q16 and FY16 bookings and revenue guidance on that same date.

17. On this news, shareholders exited the Company's stock in droves, sending its price plummeting ***28%*** on November 10, 2016, on unusually high trading volume.

18. The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a) that enterprise-level NEXIS features and functionality critical to attracting large media enterprise business would not be available for sale until September 2016—late in 3Q16;

(b) that rather than rapidly adopting Avid's NEXIS products in 3Q16, Avid's large media enterprise customers were instead refusing or deferring renewals and purchases to the fourth quarter of 2016 ("4Q16") or later; and

(c) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Avid's business, operations, earnings, projections, and financial prospects during the Class Period.

19. As a result of Defendants' false statements, Avid's stock traded at inflated levels during the Class Period. However, after the above revelations were disclosed to the market, the Company's shares were hammered by massive sales, sending them down more than 53% from their Class Period high of $9.78 per share—***or more than $5 per share***—while approximately ***$213 million*** in market capitalization evaporated.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 78aa(c)]. Avid is headquartered in this District and the acts and transactions giving rise to the violations of law complained of occurred in this District.

23. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of NASDAQ, a national securities exchange.

## III. THE PARTIES

24. David Wayne Hammond was appointed to serve as Lead Plaintiff in this Action by Order of this Court dated February 7, 2017. Dkt. No. 36. As set forth in the previously filed certification (Dkt. No. 23-2) incorporated by reference herein, Plaintiff purchased Avid securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25. Defendant Avid is headquartered in Burlington, Massachusetts. During the Class Period, Avid had more than 40 million shares of common stock outstanding, which traded in an efficient market on the NASDAQ under the ticker symbol "AVID." Avid was followed by

numerous stock analysts and stock rating agencies, and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor and analyst conferences. Avid also filed periodic public reports with the SEC and regularly issued press releases to the financial press.

26. Defendant Hernandez is, and was at all relevant times, Avid's President, CEO, and Chairman of its Board of Directors. Hernandez has been as a member of the Avid's Board of Directors since 2008. Hernandez became CEO and President effective February 11, 2013.

27. Defendant Sidi was at all relevant times during the Class Period, Avid's Interim CFO, having been named Avid's Interim CFO effective May 5, 2016, following the sudden and unexpected resignation of the Company's former CFO, John W. Frederick ("Frederick") on April 13, 2016. Sidi's tenure as Interim CFO came to an end when, effective December 12, 2016, he was replaced by Brian E. Agle, who was also named Avid's Senior Vice President. Prior to being named Interim CFO, Sidi was the Company's Vice President of Human Resources, and Sidi resumed that role on December 12, 2016.

28. Defendants Hernandez and Sidi are sometimes referred to herein as the "Individual Defendants."

29. During the Class Period, the Individual Defendants ran Avid as "hands-on" managers, overseeing Avid's operations and finances and made the material false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of Avid's financial and business operations, as they received daily reports and had access to computerized information regarding sales, costs and expenses, product demand, inventory management, and the conditions surrounding the NEXIS launch.

30. Defendants were also intimately involved in deciding which disclosures would be made by Avid during the Class Period. The Individual Defendants made various public statements for Avid during the Class Period, and participated in all Class Period investor conferences. Hernandez and Sidi also signed Avid's filings with the SEC during the Class Period, including certifications filed pursuant to the Sarbanes Oxley Act of 2002 stating the financial reports were accurate.

## IV. RELEVANT NON-PARTIES

31. Frederick became Avid's CFO, Executive Vice President, and Chief Administrative Officer on April 22, 2013, succeeding Kenneth A. Sexton ("Sexton"). Sexton, along with Gary G. Greenfield—the Company's former Chairman of the Board, CEO, and President—were replaced in connection with the Company's restatement of its financial results in September 2014, which resulted in a cumulative, prior-period reduction in previously-recognized revenue of $896.9 million for the six-year period ended December 31, 2010, as well as an overstatement of revenue by approximately $212 million in the year ended December 31, 2011.

32. Almost three years to the day after taking over as Avid's CFO, on April 13, 2016, Avid disclosed that Frederick had suddenly and unexpectedly "resigned," and that his resignation would become effective after the Company's announcements of its financial results for the first quarter of 2016 ("1Q16") and subsequent earnings call.

33. The Company followed up with another announcement on May 4, 2016, stating that Frederick's resignation from his positions as Executive Vice President, CFO, and Chief Administrative Officer became effective on May 4, 2016. The announcement also added that

Avid's Vice President of Human Resources, Defendant Sidi, would take over as Interim CFO effective May 5, 2016.[1]

34. However, the May 4, 2016 announcement also disclosed that Frederick would stay on as a highly-paid "advisor on a consultancy basis" pursuant to an agreement between the Company and Frederick ("Advisory Agreement"). Pursuant to the terms of the Advisory Agreement, Frederick would be available as needed to advise the Company. The initial term of the Advisory Agreement ended September 30, 2016, but could be extended by mutual agreement. The Advisory Agreement provided for cash compensation of $10,000 per month for Frederick, that the Company will continue to extend indemnifications to Frederick, and extended the vesting of Frederick's outstanding equity awards through September 30, 2016.

35. Soon after announcing his "resignation" and right after Defendants' positive statements on August 3, 2016, Frederick took advantage of the uptick in the Company's stock price, selling 610,319 shares of his Avid stock for total proceeds of $5,506,649 between August 12, 2016 and August 16, 2016. These insider sales at the beginning of the Class Period were unusual and suspicious in timing and amount. Indeed, Frederick did not sell any shares of Avid stock prior to or after the Class Period.

## V. SUBSTANTIVE ALLEGATIONS

### A. Avid's History and Business

36. Avid is an American technology and multimedia company that provides platforms, applications, and services that enable the creation, distribution, and monetization of

[1] When Frederick actually "resigned" from Avid is muddied by the Company's 2017 proxy statement, filed March 30, 2017, which states that Frederick resigned from his position with the Company as Executive Vice President, CFO, and Chief Administrative Officer on August 1, 2016.

audio and video content. Specifically, it develops, markets, sells, and supports software and hardware for digital media content production, management, and distribution. Digital media are video, audio, or graphic elements in which the image, sound, or picture is recorded and stored as digital values, as opposed to analog or tape-based signals.

37. The Company serves two customer markets: (1) Broadcast and Media; and (2) Video and Audio Post and Professional.

38. The Broadcast and Media market consists of broadcast, government, sports, and other organizations that acquire, create, process, and/or distribute audio and video content to a large audience for communication, entertainment, analysis, and/or forensic purposes. Customers in this industry rely on workflows that span content acquisition, creation, editing, distribution, sales, and redistribution, and utilize all content distribution platforms, including web, mobile, internet protocol television, cable, satellite, on-air, and various other proprietary platforms. For this market, the Company offers a range of open products and solutions, including hardware and software-based video and audio-editing tools, collaborative workflow and asset management solutions, and automation tools, as well as scalable media storage options and professional and consulting services. The Company sells into this market through a direct sales force and resellers.

39. The Video and Audio Post and Professional market is made up of individual artists and entities that create audio and video media as a paid service, but do not currently distribute media to end consumers on a large scale. This industry spans a wide-ranging target audience that includes: independent video editors; facilities and filmmakers that produce video media as a business but are not broadcasters; professional sound designers; editors and mixers and facilities that specialize in the creation of audio for video; songwriters; musicians; producers;

film composers and engineers who compose and record music professionally; technicians, engineers, rental companies, and facilities that present, record, and broadcast audio and video for live performances; and students and teachers in career technical education programs in high schools, colleges and universities, as well as in post-secondary vocational schools, that prepare students for professional media production careers in the digital workplace. For this market, the Company offers a range of products and solutions based on the Avid MediaCentral Platform, including hardware and software-based creative production tools, scalable media storage options and collaborative workflows, as well as a broad range of professional services. The Company sells into this market through storefront and on-line retailers, as well as through a direct sales force and resellers.

40. Avid touts its corporate strategy as a three-pillar approach to helping its customers in the media industry "navigate through . . . [a] period of unprecedented changes": Avid Everywhere, The Avid Advantage, and the Avid Customer Association ("ACA"). According to the Company's most recent 10-K:

> Avid Everywhere is our strategic vision for connecting creative professionals and media organizations with their audiences in a more powerful, efficient, collaborative, and profitable way. Central to the Avid Everywhere vision is the Avid MediaCentral Platform, an open, extensible, and customizable foundation that streamlines and simplifies workflows by tightly integrating all Avid or third party products and services that run on top of it. The platform provides secure and protected access, which enables the creation and delivery of content faster and easier through a set of modular application suites that together represent an open, integrated, and flexible media production and distribution environment for the media industry. The Avid Advantage complements Avid Everywhere by offering a new standard in service, support and education to enable our customers to derive more efficiency from their Avid investment. Finally, the ACA is an association of dedicated media community visionaries, thought leaders and users designed to provide essential strategic leadership to the media industry, facilitate collaboration between Avid and key industry leaders and visionaries, and strengthen relationships between our customers and us.

41. Avid organizes its existing hardware and software suites and public and private marketplaces built upon Avid's MediaCentral Platform, which may be summarized as follows:

- ***Artist Suite*** encompasses all of Avid's audio and video creative tools for editing, mixing, and live sound production. Products and tools in the Artist Suite can be deployed on premise, cloud-enabled, or through a hybrid approach. Users can collaborate to access, edit, and share the same media; and collaborate with others as if they were all in the same facility.
- ***Media Suite*** included all of Avid's tools and services used to manage, protect, distribute, and monetize media, including solutions for newsroom management, asset management, and multiplatform distribution.
- ***Studio Suite*** offers solutions to securely manage, distribute, and re-purpose assets. The solutions will be based on a new metadata tracking system, where metadata will be generated algorithmically and provide a greater level of detail, making it possible to take a flexible and adaptable view of assets at any stage of the lifecycle.
- ***Storage Suite*** refers to all of Avid's products and tools used to capture, store, and deliver media, including online storage, nearline storage, and ingest/playout servers. These products and tools work in close concert with the Media Suite's tagging and asset management.
- ***Marketplaces*** provide an easy and secure way for the content creators to share or publish their products or elements. The marketplaces are designed for collaboration and distribution among individuals and enterprises.

42. On April 16, 2016, the Company announced its NEXIS solution at the National Association of Broadcasters conference. The Company lauds NEXIS as the "world's first software-defined storage platform," enabling true storage virtualization for any media application and delivering flexibility, control, and extensibility to Avid MediaCentral Platform applications. According to the Company's website:

> Avid NEXIS is designed to accelerate online and nearline production, giving teams easy on-demand access to a shared pool of storage—scalable to nearly 3 PB—that can be quickly provisioned and repurposed. Tailor and tune each workspace's capacity, performance, and drive protection to the project and client. Conveniently manage the system through a web interface or management APIs. And easily scale it to accommodate the smallest teams to the largest media enterprises.

43. NEXIS's accolades were extoled in *TV Technology* magazine, a leading industry publication with thousands of subscribers in the United States.

44. The NEXIS storage product line would come in two general sizes: (i) the NEXIS Pro systems designed for moderate-sized post houses and broadcasters; and (ii) the NEXIS Enterprise systems, E-2, E-4 and E-5, that could be scaled up to hundreds of clients accessing up to 1.4 Petabytes and more of 4K media. Each had the same underlying architecture, but were designed for different markets.

45. Avid's MediaCentral Platform, which includes its NEXIS offerings, is crucial to Avid's strategy to create cross-sale opportunities and generate long-term growth. Given the importance of drawing customers into Avid's platform, analysts have described the Company's bookings as the "key engine to the story" of Avid's growth potential. Indeed, in opening remarks from Defendant Hernandez on an August 3, 2016 conference call with analysts at the start of the Class Period, Hernandez stated, "[t]he platform is the anchor that enables [Avid] to expand business with [Avid's] existing customers and maximize value over time."

46. Large media enterprises, labeled "Tier 1" customers by Avid, in particular are critical to Avid's platform strategy and, according to the Company's last two annual reports, are the target of Avid's sales efforts. The following slides, presented by the Company at the Canaccord Genuity Growth Conference and attached as an exhibit to the Company's Form 8-K filed August 13, 2015, illustrate the importance of large media enterprise customers to the Company's growth strategy:







47. In fact, according to Defendant Hernandez's remarks made during the August 3, 2016 conference call with analysts at the start of the Class Period, large media enterprises essentially "validate" the Company's entire platform strategy:

> In Tier 1, the customers and projects, Tier 1 really validate our strategy overall. The platform is the anchor that enables us to expand business with our existing customers and maximize value over time. Once clients are on the platform they benefit from the efficiency, interoperability, and enterprise pricing, it's (sic) becomes pretty sticky and they continue to buy from Avid. And we are starting to see an increase in enterprise wide agreements which are often large multimillion dollar agreements, and these are often longer sales cycles because they are more strategic, but they result in more strategic relationships.

48. Following Avid's announcement of NEXIS on April 16, 2016, the Company began issuing warnings of delayed buying decisions in connection with its ***existing*** shared storage platforms due to NEXIS's impending release.

49. Specifically, on April 28, 2016, the Company issued a press release reducing its 1Q16 bookings guidance "primarily due to delayed buying decisions for Avid's shared storage solutions as a result of the impending next-generation storage solution product release in the second quarter, as well as the ongoing transition of the broader enterprise media market." However, in the same release, the Company also announced that NEXIS had launched, that the Company was taking NEXIS orders, and that NEXIS shipping to customers was expected to begin in 2Q16.

50. Then, in the Company's quarterly report for 1Q16, filed May 4, 2016, Avid blamed a $12.5 million, or 26.6%, decrease in its video products and solutions revenues "primarily due to delayed purchasing decisions of shared storage solutions by customers anticipating the next-generation shared storage product that [Avid] recently launched in the second quarter of 2016." During the May 4, 2016 earnings call following the release of Avid's 1Q16 results, Defendant Hernandez blamed its 1Q16 reported bookings miss of $92.5 million, compared to management's prior forecast of $100 million to $112 million, on "delayed buying decisions" due in part to the impending release of NEXIS.

51. Thus, going into the Class Period, the market was focused on whether Avid's large media enterprise customers had in fact only delayed or deferred purchases and bookings pending the release of NEXIS, and whether the Company would now fully realize those delayed or deferred sales in 3Q16 and beyond.

### B. The Class Period Begins as the Company Increases Guidance and Trumpets the Positive Impact of NEXIS's Rollout

52. Throughout the Class Period, Defendants artificially inflated Avid's stock price by presenting false and misleading financial results to investors touting large media enterprises' purported rapid adoption of NEXIS in 3Q16, when in truth large media enterprises were refusing or deferring NEXIS purchases until 4Q16 or later. In addition, Defendants knew, but failed to disclose until after the Class Period, that many enterprise-level NEXIS features critical to attracting the large media enterprise business coveted by the Company would not be available until September 2016.

53. The Class Period commences on August 4, 2016. On the prior evening, after the close of trading on August 3, 2016, Avid issued a press release announcing its 2Q16 financial results for the period ended June 30, 2016, emphasizing in its headline that Avid had "Met or Exceeded Guidance for All Metrics."

54. As to 3Q16 and FY16 financial guidance, the release stated in pertinent part as follows:[2]

---

[2] All emphasis added unless otherwise noted.

**Financial Guidance**

Q3 2016 Financial Guidance (in millions)

| | |
|---|---|
| Bookings (Constant Currency) | $105-$125 |
| Bookings | $100-$120 |
| Non-GAAP Revenue | $120-$135 |
| Non-GAAP Operating Expenses | $57-$62 |
| Adjusted EBITDA | $21-$29 |
| Adjusted Free Cash Flow | $(8)-$5 |

The Company also updated its full-year 2016 guidance, as originally provided on March 15, 2016. ***The Company is increasing its full-year guidance*** for non-GAAP Revenue and Adjusted EBITDA, ***as a result of higher conversion of bookings and revenue backlog to revenue, partly driven by new software releases***, as well as tighter cost control. The Company is also improving its guidance range for non-GAAP Operating Expenses, as a result of increasing the target for its efficiency program to up to $76 million of annualized run-rate cost savings, most of which will be achieved in 2016. The Company is reaffirming its guidance for Adjusted Free Cash Flow and Bookings, but expects to be in the lower end of the range for Bookings due to higher than expected volatility in the media enterprise market.

Full-Year 2016 Financial Guidance (in millions)

| | |
|---|---|
| Bookings (Constant Currency) | $530-$566 |
| Bookings | $500-$536 |
| Non-GAAP Revenue | $535-$565 |
| Non-GAAP Operating Expenses | $247-$260 |
| Adjusted EBITDA | $118-$135 |
| Adjusted Free Cash Flow | $2-$12 |

55. The statements in ¶54 above, including that the Company was increasing 3Q16 guidance as a result of higher conversion of bookings and revenue backlog to revenue in part due to new software releases, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS

functionality was still lacking. The increased 3Q16 guidance and the reasons therefore were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

56. In slides entitled "Avid Technology Q2 2016 Business Update" attached as an exhibit to Avid's August 3, 2016 8-K discussing 2Q16 results, Defendants repeatedly touted the Company's rapidly increasing success with large media enterprise customers. The slides extolled the "[g]rowing adoption of our platform approach" and touted the Company's "strong pipeline" of large media enterprise deals that was "driving growth" in the slide shown below:




57. The statements in ¶56 above, including the Company's statements touting the "growing adoption of our platform approach" and the Company's purportedly "strong pipeline" of large media enterprise deals that was "driving growth," were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and

(iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

58. Later that evening, on August 3, 2016, Individual Defendants Hernandez and Sidi held a conference call with investors and stock analysts and provided further positive commentary about the Company's business metrics and financial prospects. Defendant Hernandez opened his remarks discussing the Company's strong sales trends, stating in pertinent part as follows:

> I think we've seen pretty strong trends in some of our key growth initiatives. We believe this is signaling the market acceptance of our strategy. ***The platform strategy continues to resonate and adoption by enterprise users is going in a strong pace*** of 47% from year-ago.

59. The statements in ¶58 above, including that Defendants had already "seen pretty strong trends" of key growth initiatives, including the "growing pace" of "adoption by enterprise users" of Avid's platform, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by

Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

60. Defendant Hernandez went on to emphasize during the August 3, 2016 call that Avid was "***starting to see an increase in enterprise wide agreements which are often large multimillion dollar agreements***, and these are often longer sales cycles because they are more strategic, but they result in more strategic relationships."

61. The statements in ¶60 above, including that Defendants had already "seen pretty strong trends" of key growth initiatives, including the "growing pace" of "adoption by enterprise users" of Avid's platform strategy, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

62. Discussing the slide pictured in ¶56 above, Defendant Hernandez stated the following:

> And just highlight and explain some of the various initiatives that are driving the diversified growth strategy that we've talked about it. If you look at the upper left, and first on the left-hand column, you'll see Tier 1, Tier 2, Tier 3. We talked about really having strategies to exploit each across the platform. This is starting to come with more clarity and more visibility. You'll see in the upper left, the Enterprise Deals. The industry is clearly in transition and is ***driving an increase in demand among our Tier 1 customers for large enterprise deals*** to drive efficiencies and to save money.
>
> We have a robust pipeline of multi-year deals in transition and lots of interest in cloud host models which is just starting to emerge. So this is a key part of our strategy, is getting them on the platform and starting to bundle in many more products across the entire enterprise. ***We are seeing big receptivity here.*** Hopefully, we will close more of those deals going forward.

63. The statements in ¶62 above, including that Defendants were already seeing "an increase in demand among our Tier 1 customers for large enterprise deals" and that Defendants were "seeing big receptivity" with respect to enterprise platform deals, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level

NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

64. Defendant Hernandez also described NEXIS features already released in 2Q16 that would ***accelerate*** large media enterprises' adoption of NEXIS, stating,

> Naturally in the second half of the year will be focused on the rollout of NEXIS the virtualized storage which is up sequentially. ***But we have lots of powerful new features towards the end of second quarter, which is going to open up different categories of the tiers and we believe will accelerate NEXIS.***

65. The statements in ¶64 above, including that NEXIS features already released in 2Q16 would accelerate large media enterprises' adoption of NEXIS, were misleading because the statements convey the impression that features important to large media enterprises had already been released in 2Q16 and, examined in the context of Defendants' other statements, together conveyed the impression that large media enterprises were rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

66. During the August 3, 2016 conference call, a stock analyst queried why bookings were "down like $12 million sequentially," stating that "one would have thought that was NEXIS, it would have a sequential increase in product bookings, what's going on elsewhere to leave that number down?" Responding to that query, Defendant Hernandez stated that the Company had already launched features for enterprise-level deployment in 2Q16, stating:

> ***NEXIS had some key features that needed to be added in Q2 for the large enterprise deployment***. You saw a nice increase quarter-over-quarter. I think you'll see that begin to accelerate as people work through their transition to NEXIS away from ISIS.
>
> . . . .
>
> ***So we're getting some very strong receptivity once these features came out late in the quarter.*** I think you'll see that. We expect that to continue to increase. You'll see that product area go up their product line and go up . . . .

67. The statements in ¶66 above, including that Defendants were already seeing "very strong receptivity" for large enterprise deployment, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16, and that the key features for NEXIS that "needed to be added in Q2 for the large enterprise deployment" were released "late in the [second] quarter." In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order

since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

68. Responding to a question from an analyst regarding whether "large customers [were] converting to more of a recurring revenue focus with you," Defendant Hernandez stated, "[s]o ***we have a rapidly growing large enterprise deal pipeline. . . . Right now . . . we are expecting to close a few large deals nothing Sinclair like but that's not what's built into our guidance*** but we are assuming we will close a few large enterprise deals in the second half of the year and those are active discussions right now."

69. The statements in ¶68 above, including that Defendants were already seeing "a rapidly growing large enterprise deal pipeline" as well as an expectation of large deals that were not even included in, or were in addition to, Defendants' rosy 3Q16 guidance, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level

NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

70. Defendant Sidi also touted the Company's "growing pipeline of deals" with large media companies driven by NEXIS features already released in 2Q16:

> ***With Avid Everywhere platform, we are uniquely positioned to meet the involving needs of large media companies***. There are also areas that we believe have greater potential for growth and ***we have already taken steps*** to better position Avid for stronger performance in these areas in H2.
>
> Storage grew sequentially in Q2 and we believe we can further accelerate growth in the second half. ***We needed to release the enhanced features for NEXIS,*** our virtualized shared storage solution ***that we delivered in Q2*** and now we have award winning storage product and ***growing pipeline of deals.***

71. The statements in ¶70 above, including that Defendants were already seeing a "growing pipeline of deals" with large media companies driven by NEXIS features already released in 2Q16, were misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16, and that the enhanced features for NEXIS were already released. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on August 3, 2016, more than a month after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level

NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

72. In response to Defendants' August 3, 2016 positive statements concerning large enterprise users' rapid and increasing adoption of NEXIS, the price of Avid common stock increased, closing up more than 8% on August 4, 2016, alone on unusually high trading volume of almost 2.4 million shares trading, more than nine times the average trading volume over the preceding ten trading days. The price of Avid common stock continued climbing on Defendants' strong statements and product announcements during the Class Period, reaching a Class Period high of $9.78 per share in intraday trading by August 22, 2016.

73. On August 5, 2016, the Company released its quarterly report for 2Q16 on Form 10-Q ("2Q16 Form 10-Q"). Although the 2Q16 Form 10-Q blamed a six-month decrease of $10.9 million in video products and solutions revenues for the first half of 2016, as compared to the first half of 2015, on "delayed purchasing decisions of shared storage solutions by customers anticipating our next-generation shared storage product," the Company's 2Q16 Form 10-Q did not disclose or refer to any such delayed purchasing decisions occurring in 3Q16. To the contrary, the increases in 3Q16 and FY16 bookings and revenue guidance conveyed the opposite message to investors.

74. Following the glowing August 3, 2016 earnings call during which Defendants Hernandez and Sidi touted NEXIS, the release of its enhanced features, and its reception by large media enterprises, as well as the accompanying spike in the price of Avid stock, recently departed CFO Frederick—still a consultant to Avid at the time—took advantage of the opportunity caused by Defendants' positive statements to sell 610,319 shares of Avid stock for total proceeds of $5,506,649, including 152,813 shares on August 12, 2016 at approximately

$8.87 per share for proceeds of approximately $1,350,081; an additional 266,300 shares on August 15, 2016 at approximately $9.11 per share for proceeds of approximately $2,414,743; and then finally, 191,206 shares on August 16, 2016 at approximately $9.13 per share for proceeds of approximately $1,741,824. These insider sales at the beginning of the Class Period were unusual and suspicious in timing and amount. Indeed, Frederick did not sell any shares of Avid stock prior to or after the Class Period.

75. On August 26, 2016, Avid issued a press release disclosing that it would "Unveil Latest Innovations and New Products at IBC 2016," a "premier annual event for professionals engaged in the creation, management and delivery of entertainment and news content worldwide tak[ing] place on September 9-13 in Amsterdam." The release further stated that "[n]ew product additions and major updates for the Avid NEXIS™ family, the industry's first and only software-defined storage platform specifically designed for storing and managing media."

76. Then, on September 9, 2016, Avid issued a release concerning its presentation at IBC 2016, stating in pertinent part that "[n]ew high-density, high-availability Avid NEXIS solutions enable large-scale broadcast and post-production organizations to accelerate production and increase efficiency." The release quoted Defendant Hernandez discussing the enterprise NEXIS rollout, stating in pertinent part as follows:

> "Across the industry, we are seeing an unprecedented explosion of content, which drives the need for more robust storage infrastructure, greater reliability and control, and closer collaboration," said Avid Chairman, President and CEO, Louis Hernandez, Jr. ***"To address these key customer issues, we delivered Avid NEXIS earlier this year, and the adoption from media organizations of all sizes has been incredible.*** Now we are continuing to innovate with new high-density and high-availability Avid NEXIS solutions that help the largest broadcast and post-production organizations to increase operational efficiency and maximize the lifetime value of their assets."

77. The statements in ¶76 above, including that NEXIS had already been delivered earlier in 2016 and that the adoption of media organizations of all sizes had been incredible were

misleading because the statements convey the impression that large media enterprises were at that time rapidly and increasingly adopting NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of a significant portion of 3Q16 results given the statements were issued on September 9, 2016, more than two months after 3Q16 had begun; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases were deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16.

78. On October 7, 2016, a week *after* the end of 3Q16, Avid issued a release entitled "Avid Seeing Strong Demand for Avid NEXIS from Customers Globally," which stated in pertinent part as follows:

> BURLINGTON, Mass., Oct. 07, 2016 (GLOBE NEWSWIRE) -- ***Avid® (AVID) today announced significant global adoption of Avid NEXIS™***, the first and only software-defined storage platform specifically designed for storing and managing media. Since its introduction at NAB 2016, substantial numbers of production and post-production facilities have implemented Avid NEXIS. Powered by the MediaCentral® Platform, Avid NEXIS delivers dynamic virtualization and media-savvy collaboration, enabling customers to accelerate production and increase efficiency.
>
> Stop-motion animation studio LAIKA has invested in Avid NEXIS | E4 for its current and future animated feature films. "At LAIKA, we have an uptime environment—meaning we cannot have downtime—with editorial at the heart of production and multiple projects running at the same time," said Trevor Cable, Lead Media Engineer and Editorial Manager at LAIKA. "Avid NEXIS provides us with great media management, unrivaled reliability, and high bandwidth at a

competitive price. It was very easy to deploy and it's simple to create users, groups and workspaces. I have complete confidence in Avid NEXIS | E4 and plan on purchasing another for failover redundancy."

Creative post-production house Gorilla Post uses cutting-edge Avid workflows to accelerate production and dramatically enhance collaboration at every step of the creative process—from ingest and editing, to sound design and mixing, to color correction and finishing. The Dublin-based facility recently expanded its workflow to include Avid NEXIS | E2.

"With all of our Avid-centric workflows at Gorilla, Avid NEXIS was an easy choice," said Barry Reid, Managing Director and Owner at Gorilla Post Production. "Our decision was based on the continued reliability we've always experienced with Avid products. The bandwidth is so fast that any edit suite in the facility—be it offline, grade, mix or finishing suite—can access the large dailies/transcodes from our ingest station with minimal downtime. It's hugely beneficial."

Using Avid NEXIS in a provided-facilities environment for an outside broadcast production, Video Europe deployed Avid NEXIS | E4 at UK music festival, Latitude. "We required a reliable shared storage environment to handle the demands of a fast-turnaround, multi-camera live production," said Ollie Stratton, Engineer at Video Europe. "Working with mixed formats meant the workflow needed to be resilient to handle whatever was thrown at it. The combination of Media Composer® and the Avid NEXIS storage environment was a perfect match for this on-site deployment."

Other companies that have invested in Avid NEXIS include major US television broadcast networks; US basketball team The Miami Heat; Canadian broadcaster CBC; The Church of Jesus Christ of Latter-day Saints; UK independent TV production company Spun Gold; UK full-service post-production house The Edit; Belfast-based production company Paper Owl Films; French television network La Chaine Parlementaire; French sports news channel Infosport+; German broadcaster CBC; Germany's Federal Ministry of Defense; Italian digital satellite television platform Sky Italia; Arabian television channel Discovery Networks MENA; and Doha-based state-funded broadcaster Al Jazeera.

"Avid NEXIS addresses the unprecedented explosion of content and the need for more robust storage infrastructure, reliability and collaboration," said Jeff Rosica, senior vice president and chief sales & marketing officer at Avid. ***"With strong adoption across the globe, post-production organizations and broadcasters are reaping the benefits of the industry's first and only software-defined storage platform by accelerating production and increasing efficiency."***

Avid NEXIS enables fully virtualized storage so media organizations can adjust storage capacity mid-project, without disrupting workflows. Customers can select components that meet their current needs, and easily grow as their needs change.

> Avid NEXIS is the only scale-out storage solution that enables customers to dynamically tune the system to ensure that high-priority workflows always have the capacity, performance and data protection levels they require. Customers can give critical projects maximum performance, while throttling back on less critical workflows. This ability lets teams react quickly to changes, adjusting performance and protection levels to match the needs of a project at any stage in the workflow.

79. The statements in ¶78 above, including the title of the release and other statements touting the "significant" and "strong" adoption of NEXIS by post-production organizations and broadcasters, were misleading because the statements convey the impression that large media enterprises had rapidly adopted NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of ***at least*** a significant portion of 3Q16 results given the statements were issued October 7, 2016, ***a week*** after 3Q16 had finished; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases had been deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business were not available until September 2016, or the very end of 3Q16.

80. On or about October 14, 2016, ***now more than two weeks after*** the end of 3Q16, Defendant Hernandez appeared on the television show Mad Money broadcast by the cable news network CNBC. During the show, Defendant Hernandez was interviewed by Mad Money host Jim Cramer. During the interview Defendant Hernandez stated, among other things, "***[a]s you've seen, the last couple of quarters, we really appear to be surging in a couple of key***

***areas***: mainly cloud subscriptions, ***large enterprise-wide deployments***, access to the tier three market, these are the areas we're really trying to build on."

81. The statements in ¶80 above, including that Avid's large enterprise-wide deployments had been "surging" in the last couple of quarters, were misleading because the statements convey the impression that large media enterprises had rapidly and increasingly adopted NEXIS in 3Q16. In truth, at the time of the statements, and as later admitted by Defendants, large media enterprises were refusing or deferring adoption of NEXIS until 4Q16 or beyond, and NEXIS functionality was still lacking. The statements were particularly misleading when considered in the following context: (i) Defendants were already in possession of ***at least*** a very significant portion of 3Q16 results given the statements were issued October 14, 2016, ***two weeks after 3Q16 had finished***; (ii) Defendants had previously stated that customers had delayed purchases during the first two quarters of 2016 pending the release of NEXIS in 2Q16, thereby leading investors to reasonably assume these purchases had been deferred to 3Q16; (iii) NEXIS was released and available to order since at least April 28, 2016; and (iv) unbeknownst to investors, and as later admitted by Defendants, many enterprise-level NEXIS features critical to attracting large media enterprise business had not been available until September 2016, or the very end of 3Q16.

82. In response to Defendant Hernandez's comments on Mad Money following the close of trading on October 14, 2016, the price of Avid stock rose from a closing price of $7.19 on October 14, 2016, to as high as $7.48 on October 17, 2016, the next trading day, before closing that day at $7.43.

83. Defendants' misrepresentations and omissions, coupled with the Company's robust earnings guidance issued on August 3, 2016, led the market to believe that Avid would

have an incredible 3Q16. Indeed, on October 12, 2016, analyst firm BWS Financial Inc. released a report entitled "AVID: Promos and the Quarter." The analyst report stated, *inter alia*,

> AVID remains a transition story with many investors still on the sidelines waiting to see if AVID is able to follow through on its free cash flow guidance for the quarter and the full year. ***We are expecting the third quarter to end up being towards the higher end of the guidance range.***

C. **The Truth Is Revealed**

84. On November 9, 2016, after the close of trading, Avid shocked the market disclosing that both its 3Q16 bookings and revenues had come in considerably lower than Defendants had led investors to expect, blaming "the transition of the storage product line" and disclosing that "some existing enterprise clients deferred normal upgrade and renewal decisions and new customers postponed investments until the release of functionality targeted to the enterprise market."

85. During the conference call also held November 9, 2016, Defendant Hernandez further elaborated, stating, "[t]he excitement over the new NEXIS storage line initially launched for the non-enterprise market ***essentially ha[d] frozen the enterprise market as they deferred normal upgrades and renewals of the existing storage products*** until the enterprise level features were delivered for NEXIS," adding that "[t]hese enterprise level features were delivered in Q3 as expected," "[h]owever, ***ongoing storage upgrade renewal had already been deferred***." During the call, Defendant Hernandez ***admitted*** that the enterprise product deferrals pending the release of the enterprise NEXIS products was precisely "***what we had expected to happen***."

86. In response to a question from analyst regarding why Avid offered NEXIS bundle promotions given the suddenly disclosed storage and demand circumstances in 3Q16, Defendant Hernandez also revealed that the large enterprise deferrals were not new to 3Q16 but in fact, unbeknownst to investors, had already been an ongoing trend for the previous two quarters:

> The bundle promotions for NEXIS were on the non-enterprise products. So that was the product that we announced in April. We didn't expect much from that product; it was low end product that we really weren't that competitive in historically. We thought it was a good place to start, we thought we would sell into competitive situation such as an open platform. So for instance if you're using Adobe historically you couldn't use our storage, now you can with NEXIS | PRO it's called; Pro being for the individual professional or small workgroup. But it is not designed for the large enterprise user, and so we're still trying to promote that for that new market for us which is the low end, ***our base business is storage is really at the high-end enterprise feed and that's what we inadvertently froze out for a couple of quarters and it really came to roost in Q3***. And I think it's because people heard that was about to hit the market, which it did; it hit in the last month of actually very towards the end of Q3.

87. In other words, the large enterprise refusals or deferrals of NEXIS started occurring ***at the latest*** in 2Q16—and continued into 3Q16—well before Defendants began touting large enterprises' purportedly rapid and increasing adoption of NEXIS beginning on August 3, 2016.

88. Avid also reported 3Q16 bookings of $89.5 million, over 10% below the floor of Defendants' recently increased guidance of $100 million to $120 million; and revenue of $119 million, below Defendants' guidance of $120 million to $135 million. To add insult to injury, Avid also slashed the upper end of its FY16 bookings guidance down to $445 million (from $566 million) and the upper end of its FY16 revenue guidance down to $517 million (from $565 million), blaming the aforementioned storage product transition and "continued volatility in the enterprise market."

89. Analysts and investors alike were dismayed.

90. In an analyst report issued November 9, 2016 by Dougherty & Company LLC, analyst Steven Frankel commented on Avid's dismal results, including Defendants' narrow avoidance of an even larger miss, writing,

> For the third time this year, the key engine to the story—bookings—has fallen short of our expectations. The company saw continued deal slippage and some

> product transition issues in the storage business. At the same time, yet another "one-time" deferred revenue adjustment in the Pro Tools business saved the P&L from disaster. Nevertheless, management slashed Q4 guidance for bookings, revenue, Adj. EBITDA and cash flow. The latter is critically important given the company's limited borrowing capacity and lack of cash flow generation. . . .
>
> Blaming a product transition in the Storage business and continued deal slippage, bookings once again came in well short of expectations. Specifically, Q3 bookings of $89.5M were down a whopping 22% Y/Y and well short of our $115M estimate and management guidance of $100M to $120M. The company blames the bookings shortfall on continued slippage in enterprise deal, a recurring issue at Avid and the fact that enterprise customers paused ISYS storage orders ahead of the release of an enterprise-class version of the new NEXIS storage line at the end of the September.
>
> Had the company not yet again pulled down a chunk of Pro Tools-related deferred revenue and flushed it through the P&L, results would have been far worse than guidance. The company reported revenue of $119M (-13% Y/Y) and Adj. EBITDA of $22.9M, below our $127.5M/$27.7M, guidance of $120M - $135M in revenue with $21M to $29M in Adj. EBITDA and the consensus of $130.6M/$25.6M. In Q1, the company explained that the release of cloud collaboration for Pro Tools triggered an accounting change that allowed the company recognize $18M of 100% margin deferred revenue all at once. We understood that to be a one-time event, only to see it occur again in Q2 to the tune of $15M. Management failed to disclose that there was more—accounting for $12M or roughly half of Q3's Adj. EBITDA, with another $5M to be recognized in Q4. Put it another way, through the first nine months of the year, the one-time change in accounting for Pro Tools accounts for half of the company's Adj. EBITDA.

91. In another analyst report issued November 10, 2016, by BWS Financial Inc., analyst Hamed Khorsand commented on Avid's surprising turnaround, writing:

> The downbeat quarter followed by revised lower earnings guidance was not the business outlook AVID had been projecting all year. It was also not the case with how the Company had been promoting Nexis since it was released in the spring.

92. Avid's dismal 3Q16 sent shareholders scrambling from the stock. Indeed, following the November 9, 2016 3Q16 earnings release and subsequent earnings call, shareholders punished the Company's stock price, sending it plummeting 28% on November 10, 2016, on unusually high trading volume of more than 5 million shares trading, more than twelve times the average daily trading volume over the preceding ten trading days.

## VI. NO SAFE HARBOR

93. Avid's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. § 78u-5(b)(2)(A).

94. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and/or approved by an executive officer and/or director of Avid who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

95. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

96. Defendant Hernandez, by virtue of his positions as CEO, President, and Chairman of the Board, and Sidi, by virtue of his positions as Interim CFO, knew of large media

enterprises' refusal or deferral of adoption of NEXIS during the Class Period because their positions during the Class Period gave them unfettered access to the information. Hernandez and Sidi participated in the fraudulent scheme alleged herein by receiving information reflecting the true facts regarding Avid, their control over, and/or receipt of modification of, Avid's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Avid.

97. In addition, Defendants' scienter may be inferred from their admitted knowledge that large media enterprise customers were refusing or deferring renewal upgrades and other purchases in 3Q16. During the November 9, 2016 conference call, Defendant Hernandez expressly admitted that the enterprise product deferrals pending the release of the enterprise NEXIS products were precisely "what we had expected to happen." During the same call, Hernandez further admitted that large enterprise deferrals had been occurring "for a couple of quarters and it really came to roost in Q3."

98. Defendants also admitted their knowledge and expectation during the Class Period that enterprise-level features critical to attracting large media enterprise business would not be available until September 2016, or the very end of 3Q16. During the November 9, 2016 earnings call discussing Avid's 3Q16 results, Defendant Hernandez admitted the following:

> During the third quarter, what happened was some ***enterprise clients deferred certain upgrades of renewals purchases of our existing products which is what we had expected to happen as they waited for the release of the enterprise class NEXIS offerings. This was delivered in late Q3 and as we expected*** and we expected to drive improved growth in Q4.

99. On a March 23, 2017 conference call with investors discussing the Company's financial results for the fiscal year and fiscal quarter ended December 31, 2016, Defendant

Hernandez further confirmed that enterprise customers had delayed adoption of NEXIS pending the release of enterprise-level features in September 2016, stating:

> As I mentioned last quarter our rollout of NEXIS had an unintended consequence of freezing the enterprise market where we initially launched the product with capabilities targeted to the non-enterprise clients. While that was happening to our enterprise customers, which have historically been large and consistent purchases of storage chose to defer purchases until the enterprise NEXIS version was available. ***That offering was released in September of 2016, the very end of last quarter and we're now seeing the adoption from that enterprise segment.***

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

100. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact, which there was a duty to disclose.

101. In the alternative, Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory. At all relevant times, the market for Avid's common stock was an efficient market for the following reasons, among others:

(a) Avid's stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b) The Company had more than 40 million shares outstanding as of November 4, 2016. During the Class Period, on average, 517,406 shares of Avid stock were traded on a daily basis, demonstrating a very active and broad market for Avid stock and permitting a very strong presumption of an efficient market;

(c) Avid claims to be qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d) As a regulated issuer, Avid filed periodic public reports with the SEC;

(e) Avid regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f) Avid was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(g) Numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Avid stock at all times during the Class Period; and

(h) Unexpected material news about Avid was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

102. As a result of the foregoing, the market for Avid common stock promptly digested current information regarding Avid from publicly available sources and reflected such information in Avid's stock price. Under these circumstances, all purchasers of Avid common stock during the Class Period suffered similar injury through their purchase of Avid common stock at artificially inflated prices, and a presumption of reliance applies.

## IX. LOSS CAUSATION

103. During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Avid's business fundamentals and engaged in a scheme to deceive the market. Defendants knowingly misstated

then present sales trends in order to improve the market's perception of Avid's worth. By artificially inflating and manipulating Avid's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, it caused Avid's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Avid securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

104. In response to Defendants' August 3, 2016 positive statements about Avid's purportedly rapidly expanding large media enterprise business and lofty 3Q16 projections, the price of Avid common stock spiraled upward more than 8% on August 4, 2016, alone on unusually high trading volume of almost 2.4 million shares, more than nine times the average trading volume over the preceding ten trading days. The price of Avid common stock continued climbing on Defendants' strong statements and product announcements during the Class Period, reaching a Class Period high of $9.78 per share in intraday trading by August 22, 2016.

105. In response to Defendant Hernandez's comments regarding "surging" enterprise adoption of NEXIS on Mad Money following the close of trading on October 14, 2016, the price of Avid stock rose from a closing price of $7.19 on October 14, 2016, to as high as $7.48 on October 17, 2016, the next trading day, and closed that day at $7.43.

106. On November 9, 2016, after the close of trading, Defendants finally disclosed that large media enterprises had continued to defer purchases in 3Q16 and that the Company's 3Q16 financial results were far worse than the Company had for months led the investment community to expect. Defendants disclosed that Avid's large media enterprise customers had "deferred normal upgrade and renewal decisions and new customers postponed investments until the

release of functionality targeted to the enterprise market." As a result, Avid slashed the upper end of its FY16 bookings guidance down to $445 million (from $566 million) and the upper end of its FY16 revenue guidance down to $517 million (from $565 million).

107. During the conference call held that day, Defendant Hernandez further elaborated, explaining, "[t]he excitement over the new NEXIS storage line initially launched for the non-enterprise market ***essentially ha[d] frozen the enterprise market*** as they deferred normal upgrades and renewals of the existing storage products until the enterprise level features were delivered for NEXIS." Even though NEXIS class enterprise-level features were delivered in September 2016 "as expected," "ongoing storage upgrade renewal ***had already been deferred***." During the call, Defendant Hernandez admitted the large media enterprise deferrals were precisely "***what we had expected to happen***." Moreover, Hernandez also admitted that large enterprise deferrals had been occurring "***for a couple of quarters***"—in other words, the large enterprise deferrals started occurring in 2Q16, well before Defendants touted Avid's rapidly increasing large media enterprise business almost halfway through 3Q16 on August 3, 2016.

108. On this news, the Company's stock price plummeted *28%* on November 10, 2016, on unusually high trading volume.

109. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly. This decline removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

110. The decline in the price of the Company's common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in the Company's common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

111. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X. CLASS ACTION ALLEGATIONS

112. This is a class action on behalf of those who purchased or otherwise acquired Avid common stock during the Class Period, excluding Defendants (the "Class"). Excluded from the Class are Defendants and officers and directors of the Company, as well as their respective families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

113. Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Avid common stock; and (e) the extent of and appropriate measure of damages.

114. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT II**

**For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

115. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

116. Throughout the Class Period, Defendants Avid and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Avid common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

117. During the Class Period, Defendant Avid and the Individual Defendants, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mail, which was intended to, and throughout the Class Period did: (a) artificially inflate and maintain the market price of Avid common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Avid common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants Avid and the Individual Defendants, took the actions set forth herein, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

118. In addition to the duties of full disclosure imposed on Defendants Avid and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Avid's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. § 210.01, *et seq*.) and S-K (17 C.F.R. § 229.10, *et seq*.).

119. Defendants Avid and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

120. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Avid common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Avid common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Avid and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Avid stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

121. Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Avid and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Avid shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

122. By virtue of the foregoing, Defendants Avid and the Individual Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

123. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT III

### For Violation of § 20(a) of the Exchange Act Against Individual Defendants Hernandez and Sidi

124. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

125. Defendants Hernandez and Sidi had control over Avid and made the material false and misleading statements and omissions on behalf of Avid within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions, board membership (in the case of Defendant Hernandez) and stock ownership, Individual Defendants Hernandez and Sidi had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading. The Individual Defendants were all provided with or had unlimited access to the Company's internal reports, press releases,

public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

126. As set forth above, Avid, Hernandez, and Sidi each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and/or omissions as alleged in this Complaint. By reason of such wrongful conduct, and their positions as controlling persons, Defendants Hernandez and Sidi are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants Hernandez's and Sidi's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XII. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 14, 2017

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR.
FRANK J. JOHNSON

s/ Michael I. Fistel, Jr.
MICHAEL I. FISTEL, JR.

40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
michaelf@johnsonandweaver.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 W Broadway, Suite 1540
San Diego, CA, 92101
Telephone: 619/230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com

*Lead Counsel for Lead Plaintiff*

HUTCHINGS BARSAMIAN MANDELCORN, LLP
THEODORE M. HESS-MAHAN
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
thess-mahan@hutchingsbarsamian.com

*Liaison Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 14, 2017.

s/ MICHAEL I. FISTEL, JR.

MICHAEL I. FISTEL, JR.

JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
E-mail: michaelf@johnsonandweaver.com