UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PRAKASH MOHANTY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:16-cv-12336-IT |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| AVID TECHNOLOGY, INC., LOUIS HERNANDEZ, JR., and ILAN SIDI, | ) ) ) | |
| Defendants. | ) ) ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................................. 1

II.    STATEMENT OF FACTS ................................................................................................... 2

       A.     The Company's Background and Its Innovative New Product ............................... 2

       B.     Avid Touts Surging 3Q16 Performance and Growth Due to Its New Product ................. 3

       C.     The Truth Is Revealed ............................................................................................. 5

III.   LEGAL ARGUMENT ......................................................................................................... 7

       A.     The Complaint Adequately Alleges Material Misstatements and Omissions .................... 7

              1.     Defendants' Misstatements and Omissions Created the False Impression
                     That NEXIS Was Fully Released and Ramping Up ............................................. 8

              2.     Defendants' Misstatements and Omissions Are Not "Puffery" ........................... 10

              3.     Defendants' Statements Are Not Protected by the PSLRA Safe Harbor ............. 11

                     a.     Defendants' Statements of Present and Historical Fact Are Not
                            Protected by The PSLRA Safe Harbor ..................................................... 12

                     b.     Defendants' Cautionary Language Was Not Meaningful ......................... 14

       B.     The Complaint Adequately Establishes a Strong Inference of Scienter ......................... 16

              1.     Defendants' Admissions Raise a Cogent and Compelling Inference that
                     Defendants Knowingly or Recklessly Misled Investors ..................................... 17

              2.     The Importance of NEXIS and Large Media Enterprise Business to Avid
                     Raises a Strong Inference of Scienter .................................................................. 18

              3.     The Close Temporal Proximity Between Defendants' Misstatements and
                     Disclosures Raises a Strong Inference of Scienter .............................................. 18

              4.     Former CFO Stock Sales, Unusual and Suspicious in Timing and
                     Amount, Raise a Strong Inference of Scienter .................................................... 19

              5.     Defendants' Proposed Opposing Inference Is Not as Compelling ...................... 20

       C.     Plaintiff Adequately Alleges Control Person Liability .................................................... 20

IV.    CONCLUSION ................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ................................................................................................ 7, 14, 18

*Arkansas Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*,
    2009 U.S. Dist. LEXIS 93820 (D.N.H. 2009) ................................................................ 11, 14, 15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................... 7

*Brumbaugh v. Wave Sys. Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) ...................................................................................... 20

*Chalverus v. Pegasystems, Inc.*,
    No. 97-12570-WGY, 59 F. Supp. 2d 226 (D. Mass. 1999) .................................................. 14, 18

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
    12 F. Supp. 3d 225 (D. Mass. 2014) ........................................................................................ 20

*City of Brockton Ret. Sys.*,
    2013 U.S. Dist. LEXIS 181627 (D.N.H. Dec. 30, 2013) .......................................................... 12

*City of Providence v. Aeropostale, Inc.*,
    2013 U.S. Dist. LEXIS 44948 (S.D.N.Y. Mar. 25, 2013) ......................................................... 14

*Crowell v. Ionics, Inc.*,
    No. 03-10393-WGY, 343 F. Supp. 2d 1 (D. Mass. 2004) ......................................................... 18

*Drexler v. TEL NEXX, Inc.*,
    No. 13-cv-13009-DPW, 125 F. Supp. 3d 361 (D. Mass. 2015) ................................................... 6

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) .................................................................................................... 16

*Frappier v. Countrywide Home Loans*,
    750 F.3d 91 (1st Cir. 2014) ........................................................................................................ 7

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................................... 19

*Friedberg v. Discreet Logic*,
    No. 96-11232-EFH, 959 F. Supp. 42 (D. Mass. 1997) .............................................................. 18

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) .................................................................................................... 20

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

**CASES (cont.)**

*Gretsky v. Edelstein & Co. LLP*,
  No. 10-11122-RWZ, 2011 U.S. Dist. LEXIS 20047 (D. Mass. Feb. 14, 2011) ............................. 6

*In re Ariad Pharm. Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2016) ........................................................................... 7, 8, 9, 17

*In re Biogen Inc. Sec. Litig.*,
  No. 15-13189-FDS, 193 F. Supp. 3d 5 (D. Mass. 2016) ............................................................ 11

*In re Biopure Corp. Derivative Litig.*,
  No. 04-10177-NG, 424 F.Supp.2d 305 (D. Mass. 2006) ............................................................ 18

*In re Cabletron Sys.*,
  311 F.3d 11 (1st Cir. 2002) ........................................................................................... 9, 19

*In re FirstEnergy Corp. Sec. Litig.*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004) .............................................................................. 15

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  416 U.S. App. D.C. 267 (2015) .............................................................................. 14, 15

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) .............................................................................. 16

*In re Parametric Tech. Corp. Sec. Litig.*,
  No. 98-11328-GAO, 300 F. Supp. 2d 206 (D. Mass. 2001) ........................................................ 11

*In re Sepracor, Inc., Sec Litig.*,
  No. 02-CV-12235-MEL, 308 F. Supp. 2d 20 (D. Mass. 2004) .................................................... 11

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  No. 07-cv-30238-MAP, 604 F.Supp.2d 332 (D. Mass. 2009) ...................................................... 17

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) ...................................................................................... passim

*In re Tyco Int'l., Ltd. Multidistirct Litig.*,
  2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ............................................................ 12

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .............................................................................. 10

*Levy v. Gutierrez*,
  2017 U.S. Dist. LEXIS 68016 (D.N.H. May 4, 2017) ...................................................... 12, 17, 20

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

**CASES (cont.)**

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) ...................................................................................................... 16

*McKenna v. Smart Techs. Inc.,*
    2012 U.S. Dist. LEXIS 118312 (S.D.N.Y. Aug. 21, 2012) ......................................... 11

*Miss Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.,*
    523 F.3d 75 (1st Cir. 2008) ........................................................................ 7, 10, 15, 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015). .............................................................................. 8, 10, 11, 13

*OrbusNeich Med. Co. v. Boston Sci. Corp.,*
    No. 09-10962-JLT, 694 F. Supp. 2d 106 (D. Mass. 2010) ........................................ 10

*Orton v. Parametric Tech. Corp.,*
    No. 03-10290-WGY, 344 F. Supp. 2d 290 (D. Mass. 2004) ...................................... 11

*Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc.,*
    No. 05-11165-WGY, 445 F. Supp. 2d 170 (D. Mass. 2006) ...................................... 15

*SCVNGR, Inc. v. eCharge Licensing, LLC,*
    No. 13-12418-DJC, 2014 U.S. Dist. LEXIS 135408 (D. Mass. Sept. 25, 2014) .......... 20

*Shaw v. Digital Equip. Corp.,*
    82 F.3d 1194 (1st Cir. 1996) ...................................................................... 9, 12, 18, 19

*Sloman v. Presstek, Inc.,*
    2007 U.S. Dist. LEXIS 69475 (D.N.H. Sept. 18, 2007) ...................................... 17, 18

*Sousa v. Sonus Networks, Inc.,*
    No. 16-10657-GAO, 2017 U.S. Dist. LEXIS 87375 (D. Mass. June 6, 2017) ............. 13

*State v. Long,*
    293 Conn. 31 (2009) ................................................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) .................................................................................................... 16

*Tutor Perini Corp. v. Banc of Am. Sec. LLC,*
    842 F.3d 71 (1st Cir. 2016) ..................................................................................... 9, 10

*United States v. Vanvliet,*
    542 F.3d 259 (1st Cir. 2008) ........................................................................................ 7

## <u>TABLE OF AUTHORITIES (cont.)</u>

**Page(s)**

**STATUTES**

15 U.S.C.§78j(b) ............................................................................................... 2, 9, 20

15 U.S.C.§78t(a) ................................................................................................ 2, 20

15 U.S.C. §78u-4 ........................................................................................ 7, 8, 11, 14

15 U.S.C. §78u-4(b)(2) ................................................................................... 16

15 U.S.C. §78u-5(i)(1) ..................................................................................... 11

**RULES**

Fed. R. Civ. P. 9(b) ......................................................................................... 7

Fed. R. Civ. P. 12(b)(6) .................................................................................. 7

Lead Plaintiff David Wayne Hammond ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiff's Corrected Amended Complaint (Dkt. Nos. 43–44-8) ("Motion" or "Mot.").

## I.  INTRODUCTION

Going into the Class Period,[1] investors were focused on whether Defendant Avid Technology, Inc.'s ("Avid" or "Company") critical "Tier 1" large media enterprise customers had adopted Avid's NEXIS product, the industry's first and only software-defined storage platform specifically designed for storing and managing media.  At the start of the Class Period, Defendants stated NEXIS had launched and dropped previous warnings of delayed buying decisions pending the release of NEXIS.  Defendants also increased quarter-over-quarter bookings guidance for the third quarter of 2016 ("3Q16").  These statements led investors to believe the Company had already realized (and would continue realizing) those delayed sales in 3Q16.  Then, throughout the Class Period, Defendants reinforced this belief by touting surging demand and bookings by its most important customers—i.e., large enterprises—when in truth, these customers were continuing to delay and defer purchases.  When the truth finally emerged—that in fact the large enterprise market had been "frozen" in 3Q16, that enterprise-level NEXIS features and functionality critical to attracting large enterprise business had not been available for sale until September 2016, and that Defendants alone knew this to be the case all along—Avid's stock price collapsed, damaging investors.

Contrary to Defendants' rhetoric, this litigation is ***not*** "manufactured."  Mot. at 1.  Rather, it is the product of Defendants' repeated, authoritative false statements giving the impression that production and distribution of NEXIS were ramping up smoothly throughout the Class Period.  To the extent this case concerns Defendants' 3Q16 projections, Avid's 3Q16 guidance was misleading for omitting material facts then known to Defendants—namely, that Avid's critical large enterprise market was "frozen" in 3Q16 and key enterprise-level features of NEXIS would not be made available until the very end of 3Q16.  In fact,

---

[1] The Class Period is between August 4, 2016 and November 9, 2016, inclusive.  ¶¶1, 8, 53, 84, 92.  "¶" references herein are to the Corrected Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 42) (the "Complaint").

throughout 3Q16 and **weeks thereafter** (i.e., while certainly aware of Avid's 3Q16 results regarding its most important customers), Defendants **continued** flaunting "surging" large enterprise deployments.

At the end of the Class Period, while discussing Avid's 3Q16 results, Defendants admitted **for the very first time** that the enterprise market had been **frozen for two quarters** pending the release of enterprise-level NEXIS features critical to attracting large enterprises that, unbeknownst to the public and contrary to Defendants' representations, **were not made available** until the very end of 3Q16. And even when these critical features were finally released in September 2016 "as expected," "ongoing storage upgrade renewal **had already been deferred**."[2]  ¶¶16, 85, 107. As a result, Avid's 3Q16 bookings and revenue were substantially lower than investors were led to expect both during and after 3Q16. Defendants' shocking disclosures caused Avid's stock to plummet 28% on November 10, 2016, on unusually high trading volume.

Finally, Defendants claim insulation from liability for purportedly "forward looking" statements or "puffery," and that the Complaint fails to plead a strong inference of scienter. As detailed herein (*see infra*, III.A.2–3), each argument fails. As such, and because the Complaint states a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, Defendants' Motion should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   The Company's Background and Its Innovative New Product

Avid is a technology and multimedia company based in Burlington, Massachusetts that provides audio and video applications and services. ¶¶2, 36. Bookings are the "key engine to the story" of Avid's growth potential. ¶¶5, 45, 90. Indeed, Avid's Chairman of the Board, President, and CEO, Defendant Louis Hernandez, Jr. ("Hernandez"), has explained: "[t]he platform is the anchor that enables [Avid] to expand business with [Avid's] existing customers and maximize value over time." ¶¶1, 5, 45, 47. Large media enterprises, labeled "Tier 1" customers by Avid, are particularly critical to Avid's platform strategy and, according to Avid's last two annual reports, are the target of its sales efforts. ¶¶5, 46–47. Avid's public statements have consistently extolled the importance of large media enterprises to its growth strategy. *Id.*

---

[2] Unless otherwise noted, emphasis is added and citations and quotations are omitted.

On April 16, 2016, Avid announced its new, innovative NEXIS platform, which replaced Avid's previous "ISIS" platform offerings.  ¶¶3, 42, 75.  Following this announcement, Avid began issuing warnings of delayed buying decisions in April 2016 relating to its *existing* shared storage platforms due to NEXIS's impending release.  ¶¶6, 48.  On April 28, 2016, Avid reduced its bookings guidance for the first quarter of 2016 ("1Q16"), but also announced that NEXIS had launched, Avid was taking NEXIS orders, and NEXIS was expected to ship to customers beginning in the second quarter of 2016 ("2Q16").  ¶49.

**B.      Avid Touts Surging 3Q16 Performance and Growth Due to Its New Product**

At the start of the Class Period, the market was focused on whether Avid's large media enterprise customers had in fact only delayed or deferred purchases and bookings pending the release of NEXIS, and whether Avid would now fully realize those delayed or deferred sales in 3Q16 and beyond.  ¶¶7, 51.

After the close of trading on August 3, 2016, Avid issued a press release announcing *increased* quarter-over-quarter bookings and revenue guidance for 3Q16 and *increased* revenue guidance for the fiscal year of 2016 ("FY16"), noting such increases were the "*result of higher conversion of bookings* and revenue backlog to revenue, partly driven by new software releases."  ¶54.

During an earnings conference call on August 3, 2016 ("Aug. 3 Earnings Call"), Hernandez and Defendant Ilan Sidi ("Sidi"), Avid's then-Interim CFO, repeatedly flaunted Avid's rapidly increasing success with large enterprise customers.  ¶¶27, 56, 58, 60, 62, 68.  Hernandez noted, "[t]he platform strategy continues to resonate and *adoption by enterprise users is going in a strong pace* of 47% from year-ago." ¶58.  Hernandez also emphasized that Avid was "*starting to see an increase* in enterprise wide agreements which are often large multimillion dollar agreements."  ¶¶47, 60.  Hernandez stated, "[t]he industry is clearly in transition and is *driving an increase in demand among our Tier 1 customers for large enterprise deals* . . . ."  ¶¶10, 62.  Hernandez explained that NEXIS features *already released* in 2Q16 would accelerate large enterprise adoption of NEXIS.  ¶64.

During the Aug. 3 Earnings Call, a stock analyst queried why bookings were "down like $12 million sequentially," noting that "one would have thought that was NEXIS, it would have a sequential increase in product bookings, what's going on elsewhere to leave that number down?"  ¶66.  Hernandez

explained Avid had **already launched** the critical enterprise-level deployment features in 2Q16, stating, "**NEXIS had some key features that needed to be added in Q2 for the large enterprise deployment**," and added Avid was "getting some very strong receptivity once **these features came out late in the quarter**." *Id.* When asked whether "large customers [were] converting to more of a recurring revenue focus," Hernandez exclaimed, "we have **a rapidly growing large enterprise deal pipeline**." ¶68. Sidi also touted Avid's **active steps** towards meeting its growth potential with large enterprises driven by NEXIS features **already released** in 2Q16, noting Avid "ha[s] already taken steps" to capitalize on its "unique[] position[ing] to meet the involving needs of large media companies," and that Avid "**delivered** [NEXIS features] **in Q2**" to meet that "growing pipeline of deals." ¶70.

On August 5, 2016, Avid released its 2Q16 report on Form 10-Q ("2Q16 10-Q"). ¶¶13, 73. Notably, the 2Q16 10-Q dropped the delayed and deferred purchase decisions warnings issued by the Company in April and May 2016. ¶¶13, 49–50, 73.

Following the glowing Aug. 3 Earnings Call during which Hernandez and Sidi touted large enterprise reception of NEXIS, Avid's recently departed CFO John W. Frederick ("Frederick")—who, despite his recent departure, was still an Avid corporate insider and highly-paid consultant—took advantage of Avid's escalating stock price (*see* ¶¶12, 72, 104) caused by Defendants' false statements and omissions to sell **$5,506,649** of Avid stock between August 12, 2016 and August 16, 2016. ¶¶27, 35, 74. These insider sales were unusual and suspicious in both timing and amount—indeed, Frederick did not sell **any** Avid shares prior to **or** after the Class Period. *Id.*

On August 26, 2016, Avid issued a press release disclosing it would "[u]nveil Latest Innovations and New Products at IBC 2016," including "[n]ew product additions and major updates for the Avid NEXIS™ family." ¶75. On September 9, 2016 (i.e., near the end of 3Q16), an Avid release quoted Hernandez as stating that, to cater to Avid's key customers, Defendants "**delivered Avid NEXIS earlier this year, and the adoption from media organizations of all sizes has been incredible**." ¶76.

On October 7, 2016, a week **after** 3Q16 ended, Avid issued a release entitled "Avid Seeing Strong Demand for Avid NEXIS from Customers Globally," explaining Avid "today announced significant global

adoption of Avid NEXIS," and "[w]ith strong adoption across the globe, post-production organizations and broadcasters are reaping the benefits of [NEXIS]."   ¶78.

Then, on October 14, 2016—*more than two weeks after* the end of 3Q16—Hernandez appeared on the television show Mad Money broadcasted by the cable news network CNBC.   ¶80.   During the show, while being interviewed by host Jim Cramer, Hernandez stated, "*[a]s you've seen, the last couple of quarters, we really appear to be surging in a couple of key areas*: mainly cloud subscriptions, *large enterprise-wide deployments*, access to the tier three market, these are the areas we're really trying to build on."   *Id.*   In response to Hernandez's positive comments, Avid stock rose from a closing price of $7.19 per share on October 14, 2016, to as high as $7.48 per share on October 17, 2016, the next trading day, closing at $7.43 per share.   ¶¶82, 105.

### C.   The Truth Is Revealed

On November 9, 2016, after trading closed, Avid shocked the market by disclosing 3Q16 bookings of $89.5 million, *over 10% below the floor* of its recently increased bookings guidance; and revenue of $119 million, below guidance of $120–$135 million.   ¶88.   Avid also slashed the upper end of its FY16 bookings guidance down to $445 million (from $566 million) and the upper end of its FY16 revenue guidance down to $517 million (from $565 million), blaming the aforementioned storage product transition and "continued volatility in the enterprise market."   *Id.*

During an earnings conference call also held November 9, 2016, Hernandez elaborated, "[t]he excitement over the new NEXIS storage line initially launched for the non-enterprise market *essentially ha[d] frozen the enterprise market* as they deferred normal upgrades and renewals of the existing storage products *until the enterprise level features were delivered for NEXIS*," adding, "[t]hese enterprise level features were delivered in Q3 *as expected* . . . .   However, ongoing storage upgrade renewal *had already been deferred*."   ¶85.   During the call, Hernandez admitted the enterprise product deferrals pending the

release of enterprise NEXIS products was precisely "*what we had expected to happen*,"[3] despite previously

acclaiming the release and rapid adoption (i.e., purchases and bookings) of enterprise NEXIS products. *Id.*

In response to an analyst question, Hernandez further revealed that large enterprise deferrals were

*not* new to 3Q16, but in fact, unbeknownst to investors, had been an ongoing trend for *two quarters*: "our

base business is storage is really at the high-end enterprise feed and that's what we inadvertently froze out

*for a couple of quarters and it really came to roost in Q3*." ¶86.  Thus, large enterprise refusals or deferrals

of NEXIS began, *at the latest*, in 2Q16—and continued into 3Q16—well before Defendants began touting

purported rapid and increasing adoption of NEXIS by large enterprises beginning August 3, 2016. ¶87.

Analysts and investors alike were shocked.  ¶89.  In a November 9, 2016 analyst report, analyst

Steven Frankel detailed Avid's dismal results, specifically bookings, and its narrow avoidance of an even

larger miss in revenue accomplished *only* by Avid's accounting sleight of hand.  ¶90.  In another analyst

report issued November 10, 2016, analyst Hamed Khorsand commented on Avid's surprisingly negative

3Q16, stating, "[t]he downbeat quarter followed by revised lower earnings guidance *was not the business

outlook AVID had been projecting all year*.  It was also not the case with how *the Company had been

promoting Nexis since it was released* in the spring." ¶91.

---

[3] Defendants vigorously contest the accuracy of various transcripts of the November 9, 2016 earnings conference call during which Hernandez made such comments, going as far as to submit an unauthenticated audio recording of the conference call.  Mot. at 8–10.  Of course, the characterization of Hernandez's comments is a fact issue inappropriate for resolution upon a motion to dismiss.  *Gretsky v. Edelstein & Co. LLP*, No. 10-11122-RWZ, 2011 U.S. Dist. LEXIS 20047, at *5 (D. Mass. Feb. 14, 2011) ("While defendants dispute this characterization of events, it is a factual issue that cannot be resolved on a motion to dismiss.").  Moreover, a non-moving party's version of facts, and not a moving party's characterization thereof, controls at the motion to dismiss stage.  *Drexler v. TEL NEXX, Inc.*, No. 13-cv-13009-DPW, 125 F. Supp. 3d 361, 374 (D. Mass. 2015) ("Here, the parties dispute the nature of [the plaintiff's] job.  At this stage, [the plaintiff's] characterization of his job controls.  Because the defendants bear the burden here, this disputed issue may not be resolved in their favor.").  This factual dispute is further underscored by the transcripts Defendants reference in their brief (Mot. at 7 n.8), which themselves offer varying versions of Hernandez's statement, *none* of which match Defendants' own characterization.  Furthermore, regardless of Defendants' expectations (or self-serving characterization thereof)—and *as Defendants admitted*—the NEXIS enterprise market had *already* been "frozen" *for two quarters* pending the *undisclosed yet expected delay* in launch of enterprise-level NEXIS features.  ¶¶16, 18, 84–87.  Finally, even (improperly) assuming Defendants' characterization is accurate, Defendants nevertheless made other false statements regarding Avid's purported success with large enterprises *after* 3Q16 had ended (*e.g.*, ¶¶78, 80) when Defendants were *aware*—and not just expecting—that Avid had badly missed its rosy 3Q16 guidance.

Avid's dismal 3Q16 sent shareholders scrambling from the stock, causing its share price to plummet **28%** on November 10, 2016, on unusually high trading volume of more than five million shares, over 12 times the average daily trading volume over the preceding ten trading days.  ¶92.

## III.   LEGAL ARGUMENT

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *Frappier v. Countrywide Home Loans*, 750 F.3d 91, 96 (1st Cir. 2014).  The Complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Complaint adequately pleads: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Miss Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008).  Defendants concede each of these elements (including materiality and loss causation), with the exception of falsity and scienter, thus any such arguments with respect to such elements are now waived.  *In re Ariad Pharm. Sec. Litig.*, 842 F.3d 744, 753 (1st Cir. 2016); *United States v. Vanvliet*, 542 F.3d 259, 265 n.3 (1st Cir. 2008) ("Arguments raised for the first time in a reply brief are waived.").

### A.      The Complaint Adequately Alleges Material Misstatements and Omissions

To plead falsity under the PSLRA and Rule 9(b), a complaint need only "'specify each allegedly misleading statement or omission' including its time, place and content" and provide facts showing "why the statements or omissions were misleading." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002).  The First Circuit has explicitly recognized that "the falsity of a statement and the materiality of a false statement are questions for the jury." *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005).  Because "[t]he existence of a material omission is usually a question for the trier of fact," securities fraud claims should not be dismissed for failure to plead that element unless "as a matter of law the complaint fails to raise a reasonable inference that [there] was a material omission." *Boston Scientific*, 523 F.3d at 87.  An opinion statement may be misleading to an ordinary investor if the speaker either did not in fact hold the stated opinion, or omitted material facts that, if known by investors, would lead them to

doubt the reliability thereof.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328–29 (2015).

The Complaint alleges Defendants made two related categories of false and misleading statements and omissions during the Class Period concerning: (i) Avid's purportedly successful launch of NEXIS (¶¶54, 64, 76, 78); and (ii) Avid's purported success generating large media enterprise business (¶¶10, 56, 58, 60, 62, 68, 70, 76, 78, 80).  The Complaint alleges, in detail, why each of these statements was false and misleading.  *See* ¶¶55, 57, 59, 61, 63, 65, 67, 69, 71, 77, 79, 81.

Defendants do not (and cannot) contest that the Complaint adequately specifies each false or misleading statement and its time, place, and content.  Instead, Defendants argue they are insulated from liability for materially false and misleading statements and omissions: (i) by the PSLRA "safe harbor" applicable to forward looking statements; and (ii) by the doctrine of "puffery."  These arguments lack merit.

Defendants raise no specific challenge (other than undeveloped shotgun arguments that the Complaint "does not adequately allege a single actionable misstatement or omission by the defendants" (Mot. at 9)) to a number of the Complaint's alleged material false statements.[4]  Indeed, provided all other statutory elements are adequately alleged, the Motion must be denied if even **one** allegedly false statement is sustained.  *Ariad*, 842 F.3d at 752–53.

1.     **Defendants' Misstatements and Omissions Created the False Impression That NEXIS Was Fully Released and Ramping Up**

At the start of the Class Period, which commences almost midway through 3Q16, Defendants falsely represented that NEXIS was fully released and that all features, including features critical to attracting large media enterprise business, were then available.  *E.g.*, ¶64 ("But we have lots of powerful new features ***towards the end of second quarter***, which is going to open up ***different categories of tiers***

---

[4] *E.g.*, ¶¶47, 60 (Aug. 3 Earnings Call: Avid was "starting to see an increase in enterprise wide agreements which are often large multimillion dollar agreements . . . ."); ¶62 (Aug. 3 Earnings Call: Avid was seeing an "increase in demand . . . for large enterprise deals . . . ."); ¶70 (Aug. 3 Earnings Call: "[W]e are uniquely positioned to meet the involving needs of large media companies . . . We needed to release the enhanced features for NEXIS . . . that we delivered in Q2 . . . ."); ¶73 (the 2Q16 10-Q dropped the delayed and deferred purchase decisions warnings previously issued by Avid in April and May 2016); ¶76 (September 9, 2016 press release: "To address these key customer issues, we delivered Avid NEXIS earlier this year, and the adoption from media organizations of all sizes has been incredible.").

and we believe will accelerate NEXIS."); ¶70 ("[W]e are uniquely positioned to meet the involving needs of large media companies [and] *we have already taken steps* to better position Avid . . . .  We needed to release the enhanced features for NEXIS . . . that *we delivered in Q2* and now we have . . . storage product and growing pipeline of deals.").  These statements falsely represented large media enterprises' ramping up their adoption of NEXIS and are actionable.  *See In re Cabletron Sys.*, 311 F.3d 11, 35–36 (1st Cir. 2002) (holding statements giving "the impression that production and distribution of [an] important new product were *'ramping up' smoothly* when this was not so" are actionable, and when a company's statements create the impression that a new product is already commercially available on a large scale, "the company may then have had a duty to revise that impression if later developments substantially undermined the accuracy of the earlier statements" because the company "must disclose facts, 'if any, that are needed so that what was revealed [before] would not be 'so incomplete as to mislead'").

Given that Defendants falsely represented NEXIS enterprise features were released and large media enterprises' adoption of NEXIS was "ramping up smoothly" while simultaneously failing to disclose the truth—to wit, that the NEXIS enterprise market was "frozen" due to undisclosed delays in launching critical enterprise-level NEXIS features—this is anything but a case of "fraud-by-hindsight," as Defendants attempt to claim.  *Id.*; *Ariad*, 842 F.3d at 752–53 (reversing dismissal of Section 10(b) and other claims where defendants' "express[ions of] optimism" that occurred weeks after learning of but not disclosing "recent troubling developments created an impermissible risk of misleading investors").  In other words, given that the Complaint's alleged contemporaneous facts are directly at odds with Defendants' public statements, the "fraud by hindsight" doctrine is inapplicable.  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223–24 (1st Cir. 1996); *see also Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 91, 96 (1st Cir. 2016) (reversing summary judgment in light of evidence supporting plaintiffs' omissions-based theory of fraud arising from a failure to adequately disclose the risk of auction rate securities).

Defendants point to a statement made *three months before the Class Period* by Frederick on Avid's 2Q16 earnings call to argue Avid adequately disclosed "at the time" that "the 'bigger storage' version of NEXIS intended for use by large enterprise customers[] would not become available until 'later in the

year.'" Mot. at 4, 11 (citing 1Q16 earnings call transcript, Dkt. No. 44-3 at 10).  Yet this statement hardly disclosed that enterprise-level NEXIS features and functionality critical to attracting large media enterprise business would not be available for sale until *September 2016*, particularly in light of Defendants' statements at the start of the Class Period that such enterprise features had already been released.  ¶¶18(a), 64, 70.  Moreover, Defendants ask the Court to *accept the truth of the contents of this statement*—that "bigger storage" meant enterprise-level functionality and that "a little later in the year" (misleadingly quoted by Defendants as merely "later in the year") meant September 2016.  The Court should reject this request. *OrbusNeich Med. Co. v. Boston Sci. Corp.*, No. 09-10962-JLT, 694 F. Supp. 2d 106, 111 (D. Mass. 2010) (judicial notice may not be taken as to the truth of the contents of SEC filings).

## 2.    Defendants' Misstatements and Omissions Are Not "Puffery"

Defendants also argue various misstatements are puffery.  Mot. at 15–17.  However, the concealment of known problems impacting Avid's most important products and customers is not puffery. *See Omnicare*, 135 S. Ct. at 1329, 1333 (statements were misleading for "lack[ing] the basis for making those statements that a reasonable investor would expect"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 180–81 (S.D.N.Y. 2003) (failure to disclose "growing liquidity crisis" was actionable); *Boston Scientific*, 523 F.3d at 81, 83 ("'minimiz[ing] and misrepresent[ing] . . . problems'" and "'downplay[ing]'" concerns by saying defendant had "fixed" problems, which were characterized as mere "nuisance," was materially false and misleading).

In this case, Defendants' statements were not vague or lacking specificity.  They were made in the very particular context of large enterprise bookings—Avid's "base business" and the "key engine to the story" of its growth potential and business strategy—and often in response to direct questions from analysts regarding Avid's growth strategy.  ¶¶86, 90.  During 3Q16, investors were focused on whether Avid's large enterprise customers had in fact only delayed or deferred purchases and bookings pending the NEXIS release, and whether Avid would now fully realize those delayed or deferred sales in 3Q16 and beyond.  ¶7.

Here, Defendants repeatedly provided incomplete information and actively concealed information that would have been highly material to reasonable investors.  *Tutor Perini*, 842 F.3d at 71; *McKenna v.*

*Smart Techs. Inc.*, 2012 U.S. Dist. LEXIS 118312, at *4, *18 (S.D.N.Y. Aug. 21, 2012) (alleged knowledge four months prior to IPO of uncertainties regarding continued federal funding affecting product demand should have been specifically disclosed); *Omnicare*, 135 S. Ct. at 1329 (when defendants speak on important issues, reasonable investors expect the speaker to have ensured his representation "fairly aligns with the information in the issuer's possession at the time")*; In re Sepracor, Inc., Sec Litig.*, No. 02-CV-12235-MEL, 308 F. Supp. 2d 20, 33 (D. Mass. 2004) ("statements expressing confidence" found actionable); *Arkansas Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*, 2009 U.S. Dist. LEXIS 93820, at *37 (D.N.H. 2009) (finding omissions regarding "the substantial risk that [customer] would stop buying [products] from [defendant]" actionable).[5]

### 3.    Defendants' Statements Are Not Protected by the PSLRA Safe Harbor

Defendants' statements do not fall within the forward looking PSLRA safe harbor, which only applies to statements that are actually forward-looking and specifically "identified" as such. *See* 15 U.S.C. §78u-5(i)(1). Even if the Court were to determine that some of the challenged statements are forward-looking as a matter of law (they are not), there was no meaningful accompanying "cautionary language" that was "sufficient as a matter of law to purge the statements at issue of their claimed tendency to mislead." *GT Solar*, 2009 U.S. Dist. LEXIS 93820, at *33.

---

[5] Defendants' authority is readily distinguished. *In re Biogen Inc. Sec. Litig.*, No. 15-13189-FDS, 193 F. Supp. 3d 5, 42 (D. Mass. 2016) (cited in Mot. at 16 n.18) dealt with "subjective, optimistic statements . . . ." Here, by contrast, Defendants' misrepresentations dealt primarily with objective statements of present or historical fact. Additionally, *Orton v. Parametric Tech. Corp.*, No. 03-10290-WGY, 344 F. Supp. 2d 290, 300 (D. Mass. 2004) (cited in Mot. at 15–16), is inapposite because the defendants there made vague statements about the company's "position . . . for long-term growth," untethered to a specific product or transaction or to factual statements concerning the rate of adoption thereof. *Id.* at 301. Here, Defendants' statements concerning the purportedly rapid adoption of NEXIS were directly tied to specific products (NEXIS and MediaCentral Platform), a specific group of critical customers (large media enterprises), and a specific trend of "surging" large enterprise deployments that Defendants represented ***had been and were continuing to occur*** during the Class Period. Likewise, the defendants' statements about the company's "fundamental strength" and "strong competitive position" in *In re Parametric Tech. Corp. Sec. Litig.*, No. 98-11328-GAO, 300 F. Supp. 2d 206, 217–18 (D. Mass. 2001) (cited in Mot. at 16 n.18), were generalized expressions of confidence in the company's business potential rather than a specific product, transaction, or core client, and moreover, unlike here, concerned expectations of a ***future*** quarter rather than events that had transpired and/or were transpiring at the time such statements were made.

### a. Defendants' Statements of Present and Historical Fact Are Not Protected by The PSLRA Safe Harbor

Defendants' vague assertions aside (Mot. at 16), the vast majority of the statements at issue here (i.e., (i) Avid's purportedly successful launch of NEXIS (¶¶54, 64, 76, 78), and (ii) Avid's purported success generating large enterprise business (¶¶10, 56, 58, 60, 62, 68, 70, 76, 78, 80)) are statements of present and historical fact, and not the type of forward looking statements that in some instances the safe harbor will protect. Defendants, however, focus only on statements concerning guidance. Mot. at 16. Thus, Defendants' failure to address or challenge the vast majority of the statements identified as representations of present and historical fact nullifies any argument that the safe harbor immunizes them from liability here. *In re Tyco Int'l., Ltd. Multidistirct Litig.*, 2004 U.S. Dist. LEXIS 20733, at *44 (D.N.H. Oct. 14, 2004) (declining to consider merits of safe-harbor arguments even if valid); *see also Levy v. Gutierrez*, 2017 U.S. Dist. LEXIS 68016, at *49–*50 (D.N.H. May 4, 2017) (citing *City of Brockton Ret. Sys.*, 2013 U.S. Dist. LEXIS 181627, at *12–*13 (D.N.H. Dec. 30, 2013)).

When a court considers whether a statement falls under the safe harbor, it "must examine which aspects of the statement are alleged to be false." *Stone*, 414 F.3d at 213. When the statement in question blends forward-looking representations with others concerning present circumstances, the mere reference to future projections is not sufficient to invoke the safe harbor "if the allegation of falsehood relates to [the] non-forward-looking aspects of the statement." *Id.* The safe harbor grants no protection for "a statement whose falsity consists of a lie about a present fact." *Id.*; *Shaw*, 82 F.3d at 1213 (statements with a forward-looking aspect and "an aspect that encompasses a representation of present fact" are not protected by safe harbor); *see also Levy*, 2017 U.S. Dist. LEXIS 68016, at *48–*49 (finding "many of the allegedly actionable statements are not forward-looking in their entirety and that their claims relate to representations of then-present circumstances").

Defendants knew, and should have disclosed at the start of the Class Period, that large enterprise adoption of NEXIS was unlikely to generate positive near-term bookings and revenue for Avid because: (i) the large media enterprise business was "frozen" (¶¶16, 18), and (ii) NEXIS enterprise-level features

12

would not be available until September 2016 (¶18)—facts that were "discernable" when the false statements were made. *Omnicare*, 135 S. Ct. at 1331 ("literal accuracy is not enough: an issuer must as well desist from misleading investors by saying one thing and holding back another").

With respect to the few statements actually claimed to be forward looking, Defendants' arguments also fail. Defendants cannot cast their mid-quarter 3Q16 guidance as purely forward looking. Defendants knew—as evidenced by their own admissions—that Avid was unlikely to generate large enterprise bookings until *after* software features critical to attracting large enterprise business were released in September 2016 (at the earliest). ¶98. In fact, Defendants admitted at the end of the Class Period that their bookings and revenue miss was due to this launch delay. ¶¶84–87. Finally, Defendants' statements occurred during (and after) a quarter in progress, rather than a future quarter. *Cf. Sousa v. Sonus Networks, Inc.*, No. 16-10657-GAO, 2017 U.S. Dist. LEXIS 87375, at *13 (D. Mass. June 6, 2017) (dismissing future quarter projections but noting, "[i]t is important to remember that . . . *failures to meet projected targets* [during an ongoing quarter] might be *ongoing and therefore . . . measurable* . . . ").

In an effort to muddy the waters, Defendants misquote the Complaint to distract from Avid's increased *quarter-over-quarter* raise in bookings: "The Complaint claims that on August 3, 2016, 'Defendants increased the upper end of Avid's bookings guidance for 3Q16.' This is false." Mot. at 5 n.4 (misquoting ¶8). The Complaint in fact states: "Defendants increased the upper end of Avid's bookings guidance for 3Q16 *from $115 million to $120 million and increased the upper end of its 3Q16 revenue guidance from $120 million to $135 million*." Although Plaintiff acknowledges that including "quarter-over-quarter" in ¶8 would have clarified this allegation, Defendants cannot deny—and their Motion later admits—that Avid increased its 3Q16 guidance at the start of the Class Period. Mot. at 20 ("Avid increased its 3Q16 guidance . . . "). Moreover, Defendants' invented punctuation and omitted ellipsis, even if inadvertent, deserves strong admonishment.[6]

---

[6] *State v. Long*, 293 Conn. 31, 41 n.10 (2009) (noting "strong disapproval" of using quotes that "cut off mid-sentence without ellipses" and "stress[ing] the importance of the parties' presentation of an accurate representation of the record to [the] court"). The same footnote arguing *3Q16* bookings guidance also misleadingly quotes a statement from Avid's August 3, 2016 Form 8-K discussing Avid's reaffirmed *FY16* bookings guidance. Mot. at 5 n.4 (citing August 3, 2016 Form 8-K (Dkt. No. 44-5 at 6)).

Finally, misrepresentations and omissions concerning the key terms and benefits of important transactions—such as the purportedly surging adoption of NEXIS here—are actionable and are not covered by the safe harbor. *Aldridge*, 284 F.3d at 83 (false statements of expected revenue related to rollout of new product that was "important to the[] . . . survival . . . of the company" were actionable); *City of Providence v. Aeropostale, Inc.*, 2013 U.S. Dist. LEXIS 44948, at *37 (S.D.N.Y. Mar. 25, 2013) ("Plaintiff does not need to rely on the falsity of [the company's] financial projections in order to show that they fail to disclose facts that impacted the reliability of those statements"); *Chalverus v. Pegasystems, Inc.*, No. 97-12570-WGY, 59 F. Supp. 2d 226, 231–32 (D. Mass. 1999) (statement that a contract presented an "exceptional opportunity" and would result in a $50 million profit over five years was misleading because it failed to disclose required payments that would impact revenue recognition).

### b.    Defendants' Cautionary Language Was Not Meaningful

Defendants argue that because their 3Q16 guidance was accompanied by cautionary language, the PSLRA bars Plaintiff's claim. Mot. at 16. Defendants are wrong for several reasons.

First, Defendants cannot dispute that the statements described above are not forward looking, a prerequisite to any application of the safe harbor. *See supra* III.A.3.a.

Second, should the Court find some challenged statements forward looking, the accompanying cautionary language was not "meaningful" because each statement was "misleading in light of historical fact[s] that were established at the time the statement was made." *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 416 U.S. App. D.C. 267, 279 (2015). Put simply, a warning that identifies a potential risk, but "impl[ies] that no such problems were on the horizon even if a precipice was in sight," does not meet the statutory standard for safe harbor protection. *Id.* at 279. Defendants' willful concealment and misleading characterization of these known risks rendered their other vague, irrelevant, and inconsistent disclosures "misleading in light of historical fact[s]," *id.*, and "so incomplete as to mislead." *GT Solar*, 2009 U.S. Dist. LEXIS 93820, at *32.[7]

---

[7] Indeed, the First Circuit in *Stone* rejected the defendants' argument that significant disclosures about the company's financial problems had adequately informed investors of the true risks faced, and held that the defendants' "reassuring assertions" to investors were misleading because "[i]f the Company's financial

Third, Defendants list a number of risk factors relating to issues that Plaintiff does not dispute were disclosed including, *inter alia*, "statements about Avid's 'anticipated plans, objectives, expectations and intentions,'" "estimated results of operations for 2016," "product mix and free cash flow," and "future strategy and business plans." Mot. at 6. However, none of these risk factors relate to the specific false statements alleged in the Complaint or to information that Plaintiff alleges was concealed. *See, e.g.*, ¶¶8–10, 14, 53–54, 58, 60, 62, 64, 66, 68, 70, 76, 78, 80. Defendants' attempt at misdirection underscores the fundamental point that none of their cautionary language adequately informed investors of the true risks faced, the truth of the materially false and misleading statements, or the material information concealed.

And finally, the vagueness and general nature of the risk factors that do arguably relate to issues Plaintiff alleges were misstated reveals that Defendants' argument lacks merit. For example, Defendants point to the following "risk warning": "[a]ll guidance presented by the Company is inherently uncertain and subject to numerous risks and uncertainties." Mot. at 16. But these imprecise and conditional statements do not provide ***any meaningful*** warning regarding the ***actual risks*** that Defendants knew Avid was already experiencing in connection with the "frozen" large enterprise market and undisclosed delays releasing NEXIS features critical to attracting large enterprise business. To the contrary, these are the kinds of generalized warnings that courts routinely hold insufficient to invoke the safe harbor. *See*, *e.g.*, *GT Solar*, 2009 U.S. Dist. LEXIS 93820, at *35–*37; *Harman*, 416 U.S. App. D.C. at 102; *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004).

Avid's generalized disclosures of potential risks are thus insufficient to shield Defendants from their obligation to disclose known risks that had already materialized by the time of their false statements. *See Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc.*, No. 05-11165-WGY, 445 F. Supp. 2d 170, 176–77 (D. Mass. 2006) (cautions that a company might be sued and lose lawsuits were "generic" and not "meaningful," where it announced it had a defense to a lawsuit but knew it did not); *In re MF Glob.*

---

situation was in fact as dire as alleged by the Complaint, such statements could reasonably be found to be materially misleading." *Id.* at 210; *see also Boston Scientific*, 523 F.3d at 87; *GT Solar*, 2009 U.S. Dist. LEXIS 93820, at *37. That is the case here, as any disclosures Defendants could have offered would have been ineffective given the already-frozen enterprise market and the undisclosed delays of critical features.

*Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315 (S.D.N.Y. 2013) (risk disclosures were not meaningful "in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described").

### B. The Complaint Adequately Establishes a Strong Inference of Scienter

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference" of scienter, or a mental state embracing intent to deceive, manipulate, or defraud.  15 U.S.C. §78u-4(b)(2). Scienter encompasses recklessness, and in this Circuit scienter is sufficiently alleged by facts showing *either* that defendants "consciously intended to defraud, or that they acted with a high degree of recklessness."  *Boston Scientific*, 523 F.3d at 85.  Plaintiff need not allege motive to adequately plead scienter.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).  As "[t]he strength of an inference cannot be decided in a vacuum, . . . a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007).  After viewing the Complaint holistically and taking into account competing plausible inferences, a tie goes to Plaintiff if opposing inferences are equally plausible.  *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 241 (1st Cir. 2015).

Defendants knowingly or recklessly misled investors about the growth of Avid's large enterprise business and NEXIS's commercial availability and success.  First, Defendants published statements with admitted contemporaneous knowledge suggesting that they were inaccurate or misleadingly incomplete. Second, Defendants' knowledge of the "frozen" large enterprise market may also be inferred given its critical importance to Avid.  Third, the close temporal proximity between Defendants' misstatements and later disclosure of inconsistent information supports Defendants' scienter.  Fourth, Avid's departing CFO-turned-highly paid consultant sold more than $5.5 million in Avid stock under suspicious circumstances, and his scienter may be inferred to Avid.  Finally, Defendants' proffered competing inference is insufficient to counter the Complaint's strong inference of scienter.

16

1.    **Defendants' Admissions Raise a Cogent and Compelling Inference that Defendants Knowingly or Recklessly Misled Investors**

Defendants' admissions provide particularized insight into Defendants' knowledge at the time of their misstatements. *Ariad*, 842 F.3d 744, at 751 (scienter is adequately pled "where the complaint contains clear allegations of admissions . . . suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so"). For example, during the November 9, 2016 earnings conference call, Defendant Hernandez expressly admitted that the enterprise product deferrals pending the release of the enterprise NEXIS products were precisely "what we had expected to happen." ¶97.[8] During the same call, Hernandez further admitted that large enterprise deferrals had been occurring "***for a couple of quarters*** and it really came to roost in Q3." *Id.* Defendants also admitted they knew and had "expected" that, contrary to Defendants' representations at the start of the Class Period (¶¶64, 70), enterprise-level features critical to attracting large media enterprise business had not been released and would not be available ***until September 2016—the very end of 3Q16***. ¶¶98–99. And when these critical features were finally released in September 2016 "as expected," "ongoing storage upgrade renewal ***had already been deferred***." ¶107.

These admissions are sufficient to raise a strong inference of scienter. *In re Smith & Wesson Holding Corp. Sec. Litig.*, No. 07-cv-30238-MAP, 604 F.Supp.2d 332, 344 (D. Mass. 2009) (rejecting "full picture of product demand" requirement because "absolute proof of scienter" is not required, and finding allegations describing interactions with company executives were sufficient to infer executives knew that sales demand had been decreasing despite statements that they expected sales to increase); *Levy*, 2017 U.S. Dist. LEXIS 68016, at *40–*42 (declaration based on conversations with senior management supported scienter); *Sloman v. Presstek, Inc.*, 2007 U.S. Dist. LEXIS 69475, at *27–*28 (D.N.H. Sept. 18, 2007) (statements in earnings call and press release provided "circumstantial evidence indicating that the defendants had been aware that there were serious problems in the third quarter that would affect revenue

---

[8] As noted previously (*supra* at fn. 3), the accuracy of conflicting transcripts of Hernandez's statements is a factual dispute inappropriate for resolution on a motion to dismiss. Moreover, Plaintiff's remaining allegations, viewed holistically, are independently sufficient to infer that Defendants expected (and Avid was already experiencing) significant yet undisclosed deferrals by Avid's large enterprise customers.

for the quarter"); *Aldridge*, 284 F.3d at 83 ("the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter"); *Friedberg v. Discreet Logic*, No. 96-11232-EFH, 959 F. Supp. 42, 45, 50–51 (D. Mass. 1997) (prior knowledge later disclosed fact was supported by admissions of knowing "for a long time").

### 2. The Importance of NEXIS and Large Media Enterprise Business to Avid Raises a Strong Inference of Scienter

Plaintiff's allegations regarding the importance to Avid of NEXIS, large enterprise business, and bookings further support an inference of scienter. ¶¶5, 11, 47. *See Aldridge*, 284 F.3d at 83 (scienter supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company"); *In re Biopure Corp. Derivative Litig.*, No. 04-10177-NG, 424 F.Supp.2d 305, 308 (D. Mass. 2006) ("[I]n cases in which a company's primary product or service is in jeopardy, courts have been willing to impute that knowledge to the company's officers and directors."); *Crowell v. Ionics, Inc.*, No. 03-10393-WGY, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) ("[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers."); *Chalverus*, 59 F. Supp. 2d at 235 (knowledge of debt arising out of key licensing agreement, called an "exceptional opportunity" by company president and CEO, imputed to officer defendants). Given this central importance, Defendants cannot disclaim awareness of these significant, undisclosed, adverse developments affecting NEXIS, large enterprise business, and bookings.

### 3. The Close Temporal Proximity Between Defendants' Misstatements and Disclosures Raises a Strong Inference of Scienter

The close temporal proximity between Defendants' misstatements and later disclosure of inconsistent information further supports scienter. *Shaw*, 82 F.3d at 1225 (inferring defendants' "culpable knowledge" based in part on "the proximity of the date of the allegedly misleading statements and omissions to the end of the ongoing quarter (and the date of eventual disclosure) . . . "); *Friedberg*, 959 F. Supp. 42 at 51 ("The temporal proximity between an alleged misstatement and the later disclosure of inconsistent information can provide some circumstantial factual support of the defendants' scienter."); *Sloman*, 2007 U.S. Dist. LEXIS 69475, at *27–*28 (temporal proximity of statements made "just two days before the end

of the quarter" was evidence of fraud).  Indeed, Defendants' misstatements and omissions began over a month into 3Q16 and continued beyond the conclusion of 3Q16.  During this time, Defendants repeatedly touted surging demand and bookings by its most important customers—i.e., large enterprises—when in truth these customers were continuing to delay and defer purchases, and, unbeknownst to investors, enterprise-level NEXIS features and functionality critical to attracting large media enterprise business would not be available for sale until September 2016.  ¶18.

### 4. Former CFO Stock Sales, Unusual and Suspicious in Timing and Amount, Raise a Strong Inference of Scienter

Frederick, Avid's former CFO-turned-highly paid consultant, engaged in suspicious insider sales during the Class Period.[9]  Defendants argue Frederick's significant insider stock sales "cannot support inferences of scienter," purportedly because Frederick was leaving the Company.  Mot. at 18 n.21.  As a factual matter, Frederick had not left the Company, but rather had transitioned from his role as CFO into a highly-paid consultant.  ¶34.  Moreover, the First Circuit has held that insider trades can support a strong inference of scienter even where made by a retiring insider.  *See Cabletron*, 311 F.3d at 39–40 (finding insider sales by a retiring insider provided a motive and supported a strong inference of scienter despite noting the insider's "resignation provides a plausible innocent explanation for large stock sales").  Additionally, that Frederick's stock options were expiring does not demonstrate a lack of scienter because he could "profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts . . . ."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).  Finally, Avid's scienter may be inferred from Frederick's trading.  *Shaw*, 82 F.3d at 1224 ("'insider trading in suspicious amounts or at suspicious times' may permit an inference that the trader—***and by further inference, the company***—possessed material nonpublic information at the time").[10]

---

[9] Although the Complaint discusses Defendants' conflicting statements regarding when Frederick turned from Avid's CFO to a consultant (¶33), the Motion provides no explanation or clarity regarding this issue.  Indeed, Avid first announced Frederick's resignation became effective May 4, 2016, yet later disclosed in a proxy statement that Frederick resigned as CFO on August 1, 2016, a mere ***two days*** before the Class Period begins.  *Id.*

[10] Unlike the cases Defendants cite (Mot. at 18 n.21), not only was the ***amount*** of Frederick's stock sales significant, but so was the ***timing***.  Indeed, Frederick's sales were ***all*** made during the Class Period (¶¶35, 74), while the stock was near its high point (¶¶12, 19, 72, 74), and before a big event unknown to the public

Accordingly, Frederick's insider sales, when viewed holistically with Plaintiff's other allegations, support a strong inference of scienter.[11]

### 5. Defendants' Proposed Opposing Inference Is Not as Compelling

Defendants urge the Court to adopt the competing inference that "Avid increased its 3Q16 guidance because it had beat its 2Q16 guidance and because it was further along in the process of rolling out NEXIS." Mot. at 20. This argument focuses solely on guidance and completely ignores the vast majority of the Complaint's alleged material misstatements and omissions of present or historical fact (*see supra* at III.A.3.a), including those statements occurring *after* 3Q16 was completed. Regarding 3Q16 guidance, Defendants' proposed inference of nonfraudulent intent is belied by Defendants' admissions that suggest awareness of vital information later withheld, the importance of NEXIS and large media enterprise business to Avid and its business strategy, and the suspicious insider sales of its departing CFO. As such, Defendants' proffered competing inference is insufficient to counter the Complaint's strong inference of scienter.

### C. Plaintiff Adequately Alleges Control Person Liability

By stating claims under Section 10(b) of the Exchange Act, and because Defendants do not dispute their status as control persons, the Complaint also establishes a §20(a) claim against each of the Individual Defendants. *Stone*, 414 F.3d at 194 n.3.

## IV. CONCLUSION

The Court should deny Defendants' Motion in its entirety.[12]

---

was disclosed upon release of Avid's 3Q16 financial results (¶¶35, 74, 84–92). *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 240 (D. Mass. 2014) (comparing insiders' trading activities during class period to their trading histories "determine[s] whether defendants' sales were unusual or suspicious, and thus probative of scienter . . . "); *cf. Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (stock sales not suspicious where insiders "waited to sell until after . . . an announcement which caused the price of the stock to fall").

[11] *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 253–54 (D. Mass. 2006) (insider trading allegations buttress other allegations); *see also Levy*, 2017 U.S. Dist. LEXIS 68016, at *43–*44 (insider trading is sufficient to ground a finding of scienter when combined with other evidence of scienter).

[12] If the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend. *SCVNGR, Inc. v. eCharge Licensing, LLC*, No. 13-12418-DJC, 2014 U.S. Dist. LEXIS 135408, at *18 (D. Mass. Sept. 25, 2014) (granting motion to dismiss claims without prejudice to plaintiff seeking leave to amend).

DATED:  July 31, 2017

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR.

_____
            s/ Michael I. Fistel, Jr.
            MICHAEL I. FISTEL, JR.

40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
michaelf@johnsonandweaver.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 W Broadway, Suite 1540
San Diego, CA, 92101
Telephone: 619/230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com

*Lead Counsel for Lead Plaintiff*

HUTCHINGS BARSAMIAN MANDELCORN, LLP
THEODORE M. HESS-MAHAN
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
thess-mahan@hutchingsbarsamian.com

*Liaison Counsel for Lead Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 31, 2017.

_____
            s/ Michael I. Fistel, Jr.
            MICHAEL I. FISTEL, JR.

JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
michaelf@johnsonandweaver.com