**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRAKASH MOHANTY, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Case No. 1:16-cv-12336-IT |
| Plaintiff, ) ) | |
| vs. ) | CLASS ACTION |
| ) ) | |
| AVID TECHNOLOGY, INC., LOUIS HERNANDEZ, JR., and ILAN SIDI, ) ) ) | |
| Defendants. ) ) ) | |

**DECLARATION OF MICHAEL I. FISTEL, JR. IN SUPPORT OF**
**(1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS**
**ACTION SETTLEMENT, APPROVAL OF THE**
**PLAN OF ALLOCATION, AND FINAL CERTIFICATION OF THE CLASS FOR**
**SETTLEMENT PURPOSES, AND (2) LEAD COUNSEL'S MOTION FOR**
**AN AWARD OF ATTORNEYS' FEES, PAYMENT OF EXPENSES, AND AN AWARD**
**TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     OVERVIEW OF THE LITIGATION .............................................................. 5

        A.      Procedural Background .......................................................................... 5

        B.      Substantive Allegations ........................................................................ 6

        C.      Defendants' Motion to Dismiss ............................................................ 7

III.    RESOLVING THE LITIGATION .................................................................. 11

IV.     PRELIMINARY APPROVAL OF THE SETTLEMENT ............................... 11

V.      SUMMARY OF THE SETTLEMENT AND PLAN OF ALLOCATION ........ 12

VI.     NOTICE OF SETTLEMENT ........................................................................ 14

VII.    THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT ........ 15

        A.      The Risks of Continued Litigation Support the Settlement .................. 15

        B.      The Amount Offered Supports the Settlement ...................................... 19

        C.      Lead Counsel's Investigation Supports the Settlement ........................ 20

        D.      The Settlement Was Negotiated at Arm's-Length By Experienced Counsel with a
                Nationally-Respected Mediator .......................................................... 21

        E.      The Reaction of Class Members Supports the Settlement .................... 22

VIII.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES ............ 23

        A.      Counsel Achieved an Excellent Result for the Class ........................... 24

        B.      The Risk of Litigation ........................................................................ 25

        C.      The Skill Required and the Quality and Efficiency of the Work .......... 25

D.   The Contingent Nature of the Case and the Financial Burden Carried By Lead Counsel ................................................................................................ 27

E.   The Customary Fee ............................................................................ 27

F.   A Lodestar Cross-Check Shows the Fee Request Is Reasonable ......................... 28

G.   The Reaction of the Class Supports the Requested Award.................................. 29

IX.   LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF EXPENSES ............... 29

X.   COMPENSATORY AWARD REQUEST ....................................................... 30

XI.   CONCLUSION ....................................................................................... 31

XII.   INDEX OF EXHIBITS ............................................................................. 32

I, Michael I. Fistel, Jr., hereby declare as follows:

1.      I am a partner at the law firm Johnson Fistel, LLP ("Johnson Fistel"), Court-appointed Lead Counsel for Court-appointed Lead Plaintiff David Wayne Hammond ("Lead Plaintiff"), and for the prospective Class.  Unless otherwise stated herein, I have personal knowledge of the matters set forth herein based on my active participation in all aspects of the prosecution and resolution of the above-captioned action (the "Action").  If called upon, I could and would competently testify that the following facts are true and correct.

2.      I respectfully submit this Declaration in support of (i) Lead Plaintiff's Motion for Final Approval of Class Action Settlement, Approval of the Plan of Allocation, and Final Certification of the Class for Settlement Purposes, and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Expenses, and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4).

## I.      INTRODUCTION

3.      This action alleges claims for violations of the federal securities laws on behalf of all persons and entities who purchased or otherwise acquired the common stock of Avid Technology, Inc. ("Avid") between August 4, 2016 and November 9, 2016, inclusive, and were allegedly damaged thereby (the "Class"[1]) against Defendants Avid, Louis Hernandez, Jr.

---

[1]   Excluded from the Class are Defendants, members of the immediate family of any such Defendant, any Person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has or had a controlling interest during the Class Period; the officers and directors of Avid during the Class Period; and legal representatives, agents, executors, heirs, successors, or assigns of any such excluded Person; the Defendants or any entity in which any of the Defendants has or had a controlling interest (for purposes of this paragraph, together a "Defendant-Controlled Entity"), to the extent that such Defendant-Controlled Entity itself purchased a proprietary (i.e., for its own account) interest in the Company's common stock; to the extent that a Defendant-Controlled Entity purchased Avid stock in a fiduciary capacity or otherwise on behalf of any third-party client, account, fund, trust, or employee-benefit plan that otherwise falls within the Class, neither such Defendant-Controlled Entity nor the third-party client, account, fund, trust, or employee-benefit plan shall be excluded from the Class with respect

("Hernandez"), and Ilan Sidi ("Sidi").

4. After an inquiry into the merits of the claims, assessing defenses, estimating likely damages that could be recovered by the Class, and arm's-length negotiations under the supervision of a respected mediator, Jed D. Melnick, Esq. ("Mr. Melnick") of JAMS, Lead Plaintiff has agreed, subject to Court approval, to settle this action on behalf of the Class in exchange for $1,325,000.00 (the "Settlement"). The precise terms of the Settlement are fully set forth in the previously-filed Stipulation and Agreement of Settlement dated November 30, 2017 (Dkt. No. 50-2) ("Stipulation").

5. The Settlement is the product of hard-fought litigation and was reached only after an extensive investigation conducted by Lead Counsel at the pleading stage. In this regard, Lead Counsel retained a private investigator who interviewed numerous former Avid employees. Lead Counsel also thoroughly reviewed and analyzed publicly available information regarding Avid, including, but not limited to, its United States Securities and Exchange Commission ("SEC") filings, Defendants' public statements, financial reports, press releases, media reports about Avid, analysts' reports rendered by securities firms, and Court filings from prior securities litigation involving Avid. Lead Counsel also evaluated issues concerning causation and damages, thoroughly researched the law pertinent to the claims and defenses asserted, and engaged in ongoing communications with the Court-appointed Lead Plaintiff.

6. Lead Counsel also researched and drafted the initial Complaint for Violations of the Federal Securities Laws (Dkt. No. 1), the Corrected Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 42) ("Complaint"), and engaged in motion practice opposing Defendants' Motion to Dismiss (Dkt. Nos. 43, 44, 45, 46). Lead Counsel also engaged in arm's-

---

to such Avid stock; and those Persons who timely and validly exclude themselves therefrom. Notice Order (Dkt. No. 55) at ¶ 3(a)-(b).

length settlement negotiations, including extensive mediation briefing, before an experienced, nationally-recognized mediator, Mr. Melnick, , and participated in an in-person, full-day mediation session with Mr. Melnick on August 22, 2017, in New York, New York, following which arm's-length negotiations between the parties, with the assistance of Mr. Melnick, continued for several weeks. *See* Declaration of Jed D. Melnick Esq. in Support of Final Approval of Class Action Settlement (Ex. 1 hereto) ("Melnick Decl.") at ¶4. During those negotiations, Lead Counsel made it very clear that based on its assessment of the strengths and weaknesses of this case, Lead Plaintiff would continue to litigate rather than settle for less than fair value.

7.     As a result of these efforts, Lead Counsel and Lead Plaintiff had a detailed understanding of the strengths and weaknesses of their case prior to reaching the Settlement. After additional negotiations following an agreement-in-principle, the Settlement was eventually reached and is memorialized in the Stipulation. The Settlement is a notable achievement derived from the substantial efforts of Lead Plaintiff and Lead Counsel, and is a very good result for the Class based on potential impediments to recovery, the legal hurdles and risks involved in proving liability and damages, as well as the significant risks and the delay, expense, and uncertainty of proceeding with the litigation further, including pursuing the Action through trial and any subsequent appeals. The benefit that the Settlement will provide to the Class weighs in favor of final approval, particularly when considered against the risks that the Class might recover less (or nothing) if the action were litigated through summary judgment, trial, and any appeals that would likely follow, a process that could last many additional months, or even years. In the face of these risks, a recovery of $1,325,000.00 represents a highly successful result. Lead Counsel respectfully submits that under these circumstances, the Settlement is in the best interests of the Class and should be approved as fair, reasonable, and adequate.

8.      On January 12, 2018, the Court preliminarily approved the Settlement and directed Notice of the Settlement to the Class (*See* Notice Order, Dkt. No. 55).

9.      The Class appears to overwhelmingly endorse the Settlement.  Pursuant to the Court's Notice Order, the Claims Administrator has now delivered 7,388 notice packets to potential Class Members, which included the Notice of Pendency and Proposed Settlement of Class Action (the "Notice") and the Proof of Claim and Release ("Proof of Claim," and collectively with the Notice, the "Notice Packet").  *See* Declaration of Jennifer M. Bareither Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date (Ex. 2 hereto) ("Bareither Decl.") at ¶11.  The Summary Notice was also published in *IBD Weekly* and disseminated over PR Newswire, a national newswire service, and the Notice was posted on the Claims Administrator's website at www.AvidSecuritiesSettlement.com.  The Notice advised potential Class Members of, among other things: (i) the terms of the Settlement; (ii) their right to exclude themselves from the Class; (iii) the manner for submitting a Proof of Claim and Release in order to be eligible for a payment from the Settlement Fund; (iv) the request for an award of attorneys' fees and expenses; and (v) their right to object to any aspect of the Settlement, including the Plan of Allocation, award of attorneys' fees and expenses, and Lead Plaintiff's request for a compensatory award pursuant to 15 U.S.C. §78u-4(a)(4).  While the deadline for Class members to object to the Settlement and Plan of Allocation has not yet passed, to date there have been no objections to any aspect of the settlement and no requests for exclusion from the Class have been received.[2]

10.      Rather than proceed with this litigation for years and risk obtaining little or nothing from any or all of the Defendants, the Settlement provides the Class with a substantial cash

---

[2]  The objection deadline is April 9, 2018.  If any timely objections are received, Lead Counsel will address them in a reply memorandum due no later than April 23, 2018.

recovery now.  The other terms of the Settlement are the product of careful negotiations between the Settling Parties and are set forth in the Stipulation.

11.     Accordingly, Lead Counsel, which has extensive experience in prosecuting securities class actions, strongly believes that the proposed Settlement is fair, reasonable, adequate, and in the best interests of the Class, that the Plan of Allocation is equitable and just, and that the requested fee and expense reimbursement should be awarded in full.  The following, along with the exhibits attached hereto, sets forth the principal proceedings in this matter and the major legal services provided by Lead Counsel, the negotiation of the Settlement, the terms of the Settlement, why the Settlement and the Plan of Allocation are fair and in the best interests of the Class, and the reasonableness of Lead Counsel's fee and expense request and of the requested compensatory award for Lead Plaintiff.

## II.     OVERVIEW OF THE LITIGATION

### A.     Procedural Background

12.     This Action was commenced in this Court on November 21, 2016, and alleged violations of the federal securities laws naming, collectively, Avid, Hernandez, and Sidi, and sought damages on behalf of the Class.  Specifically, the complaint alleged that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and asserted claims on behalf of all persons and entities who purchased or otherwise acquired Avid common stock during the Class Period.

13.     On February 7, 2017, pursuant to the Private Securities Class Action Reform Act of 1995, 15 U.S.C. §§ 78u-4 *et seq*. (the "PSLRA"), the Court entered an order (Dkt. No. 36) appointing David Wayne Hammond as Lead Plaintiff and appointing the law firm of Johnson &

Weaver, LLP[3] as lead counsel for the Class ("Lead Counsel").

14.     On April 19, 2017, Lead Plaintiff filed his Complaint (Dkt. No. 42), naming Avid, Hernandez, and Sidi as defendants, and seeking damages on behalf of all those who purchased or otherwise acquired the common stock of Avid between August 4, 2016 and November 9, 2016, inclusive.

### B.     Substantive Allegations

15.     Avid develops, markets, sells, and supports various software systems and hardware products for creating and manipulating digital media content.  As alleged in the Complaint, Defendants intentionally and/or recklessly misrepresented to Avid public shareholders during the Class Period material facts concerning Avid's launch of its new product, NEXIS, as well as NEXIS's reception in 3Q16 by its large media enterprise customers.  Complaint at ¶¶10-14.

16.     Shortly before the Class Period, Avid had issued warnings in April 2016 of delayed or deferred purchases pending the release of NEXIS.  *Id.* at ¶6.  At the start of the Class Period, those warnings were dropped and Avid increased its 3Q16 guidance, allegedly leading investors to reasonably believe large enterprise clients were rapidly adopting NEXIS in 3Q16 and that Avid was fully on track to realize its 3Q16 projections.  *Id.* at ¶¶13, 49–50, 73.   Lead Counsel's investigation also uncovered a television interview of Hernandez following the close of 3Q16 during which Hernandez touted "surging" large enterprise deployments.  *Id.* at ¶80.

17.     Then, at the end of the Class Period, the Complaint alleges Avid's 3Q16 revenue, and 3Q16 bookings in particular, were revealed to be substantially lower than investors were led to expect throughout the Class Period.  The Complaint alleges Defendants admitted that the enterprise market had in fact been "frozen" for the prior two quarters pending the release of

---

[3] Johnson & Weaver, LLP subsequently notified the Court that it had changed its name to Johnson Fistel, LLP.

enterprise-level NEXIS features critical to attracting large enterprises, and that large media enterprise deferrals were precisely "what [Defendants] had expected to happen."[4]  Complaint at ¶85.  Unbeknownst to the public and contrary to Defendants' representations, the Complaint alleges that those critical enterprise features were not made available until the very end of 3Q16. *Id.* at ¶98.  By the time these features were finally released, ongoing storage upgrade renewal had already been deferred.  *Id.*

18.     The Complaint further alleges that as the truth of these facts was revealed at the end of the Class Period, the price of Avid's allegedly artificially inflated common stock sharply dropped over several trading days, on unusually high trading volume.  *Id.* at ¶¶15-17.

### C.     Defendants' Motion to Dismiss

19.     Defendants filed a comprehensive motion to dismiss the Complaint on June 14, 2017 (Dkt. Nos. 43-44) ("Motion to Dismiss"), which Lead Plaintiff opposed on July 31, 2017 (Dkt. No. 45) ("Opposition"), and to which Defendants filed a Reply Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Corrected Amended Complaint ("Reply") on August 21, 2017 (Dkt. No. 46).

20.     Defendants' Motion to Dismiss argued that the Complaint failed to allege a misstatement or omission with the particularity required by the PSLRA and Fed. R. Civ. P. 9(b). Motion to Dismiss at 9–15.  Specifically, Defendants argued the Complaint (i) did not identify with particularity any false or misleading statement or omission about Avid's products or pipeline, and mischaracterized Avid's November 9, 2016 3Q16 conference call; (ii) failed to raise the

---

[4]  The context and accuracy of the November 9, 2016 conference call statement regarding what Defendants "had expected to happen" was hotly contested by the Parties in connection with Defendants' Motion to Dismiss (Dkt Nos. 43-44) and at mediation, prompting Defendants to submit an audio recording of the conference call to the Court and necessitating significant research by Lead Counsel into ancillary legal issues presented thereby.

"strong inference" of scienter required under the PSLRA; and (iii) failed to allege control person liability. *Id.* at 10-20.

21.     Defendants' Motion to Dismiss emphasized that Defendants did not provide either historical results or forward-looking guidance for any individual product, and that Avid had warned investors that bookings for all products were expected to be in the lower range of previous guidance due to higher than expected volatility in the media enterprise market. *Id.* at 5.  Defendants further argued that Avid had warned investors that its financial guidance and other forward-looking statements about Avid's "anticipated plans, objectives, expectations and intentions" "involve risks and uncertainties" and are "inherently uncertain," and that Avid's actual performance "could differ materially" from its predictions. *Id.* at 6.

22.     Defendants vigorously contested the Complaint's characterization of Defendants' alleged admissions at the end of the Class Period, arguing that Hernandez's statements, when read in context, indicated expected upgrades and renewals of Avid's existing storage products—not deferrals—to continue in 3Q16. *Id.* at 12-14.  In connection with Defendants' Motion to Dismiss, Defendants submitted an audio recording of Hernandez's November 9, 2016 conference call statements to the Court, arguing that "[w]ith proper punctuation, and fidelity to the audio recording, it is clear beyond doubt that Avid said that 'what it expected to happen' in August [2016] was continued ISIS upgrades and renewals, and that expectation turned out to be wrong." *Id.* at 2.

23.     Regarding scienter, Defendants argued that the Complaint's allegations also failed because there was no showing that Defendants knew, as of August 3rd, 2016, how 3Q16 would end. *Id.* at 18–20.  While acknowledging the Complaint's allegations that Defendants (i) knew but did not disclose that customers had been deferring purchases, and (ii) knew these deferrals would

materially impact Avid's 3Q16 results, Defendants argued the Complaint lacked specific information regarding what was known, how Defendants "knew" this information, or why Defendants deemed this information material to Avid's 3Q16 results.  *Id.* at 19.  Defendants also argued that the Complaint omitted any plausible explanation for why Defendants would intentionally or recklessly mislead investors regarding 3Q16.  Defendants proffered a competing proposed non-fraudulent inference that "Avid increased its 3Q16 guidance because it had beat its 2Q16 guidance and because it was further along in the process of rolling out NEXIS."  *Id.* at 20.

24.     On July 31, 2017, Lead Plaintiff filed his Opposition, in which he argued, *inter alia*, that (i) the Complaint adequately alleged material misstatements and omissions, including Defendants' actionable statements that created the false impression that NEXIS was fully released and ramping up, (ii) the alleged misstatements were not "puffery," (iii) the alleged misstatements were not protected by the PSLRA Safe Harbor, (iv) Defendants' cautionary language was not meaningful, and finally, that (v) the Complaint adequately established a strong inference of scienter.

25.     Regarding falsity, the Opposition highlighted the Complaint's detailed and particularized allegations regarding (i) the market's focus on whether Avid's large media enterprise customers had in fact only delayed or deferred purchases and bookings pending the release of NEXIS, and whether Avid would now fully realize those delayed or deferred sales in 3Q16 and beyond; (ii) that despite knowing large enterprise customers had delayed or deferred purchasing NEXIS in 3Q16 due to key features of the product not being available until September 2016, or the very end of 3Q16, Defendants conveyed the opposite message to investors throughout the Class Period; and (iii) that Defendants withheld material information from investors about Avid's release of its important new product and its adoption by Avid's most important customers.

Opposition at 3–10.  Lead Plaintiff's opposition also vigorously contested Defendants' arguments that (i) the Complaint's alleged misstatements were vague or lacked specificity, (ii) that these statements fell within the forward looking PSLRA safe harbor, and (iii) that Avid's generalized disclosures of potential risks were sufficient to shield Defendants from their obligation to disclose known risks that had already materialized by the time of their false statements.  Opposition at 10–16.

26.     Regarding scienter, Lead Plaintiff's Opposition asserted that (i) Defendants published statements with admitted contemporaneous knowledge suggesting that they were inaccurate or misleadingly incomplete; (ii) Defendants' knowledge of the "frozen" large enterprise market could also be inferred given its critical importance to Avid; (iii) the close temporal proximity between Defendants' misstatements and later disclosure of inconsistent information supported Defendants' scienter; (iv) Avid's departing CFO had sold more than $5.5 million in Avid stock under suspicious circumstances, and that his scienter may be inferred to Avid; and (v) Defendants' proffered competing inference was insufficient to counter the Complaint's strong inference of scienter.  Opposition at 16–20.

27.     Finally, Lead Plaintiff argued that the Complaint stated a claim under §20(a) of the Exchange Act by alleging a primary violation as well as control and culpable participation.  *Id.* at 20.

28.     Defendants filed the Reply on August 21, 2017, and vigorously disputed the arguments raised Lead Plaintiff's Opposition.  In the Reply, Defendants re-asserted their argument that Hernandez's November 9, 2016 3Q16 earnings call statements, when read in context and characterized appropriately, indicated that Avid "'expected' continued purchases and upgrades but customers 'deferred' instead."  Reply at 1.  Defendants also argued that the Complaint failed to

properly distinguish between Avid's various products, and otherwise failed to identify "a single, actionable statement and does not particularize how or why it is either false or misleading." *Id.* Defendants again attacked the Complaint's allegations of scienter, and argued that the Complaint failed to allege that any Avid officer obtained a financial benefit or had a personal reason to mislead, and otherwise failed to rebut the inference that Avid expected enterprise customers to continue purchasing Avid storage products during 3Q16, and that Defendants were caught by surprise when those customers did not. *Id.* at 1–2.

## III.    RESOLVING THE LITIGATION

29.    Following the completion of briefing on Defendants' Motion to Dismiss on August 21, 2017, the Settling Parties mediated the dispute in an effort to timely and efficiently resolve the matter. Prior to the scheduled mediation, the Settling Parties exchanged extensive mediation briefs detailing their respective claims and defenses. On August 22, 2017, the Setting Parties engaged in a full-day mediation session with Mr. Melnick at the offices of JAMS in New York, New York. Melnick Decl. at ¶4. Mr. Melnick has extensive experience mediating complex securities class actions such as this Action. *Id.* at ¶3. With Mr. Melnick's significant involvement, and following several weeks of additional negotiations, the Settling Parties were able to reach an agreement on the amount of funds to be recovered for the Class ($1,325,000.00). *Id.* at ¶4. After additional negotiations regarding ancillary terms, the Settling Parties ultimately executed the Stipulation which embodies the terms of the Settlement on November 30, 2017 (Dkt. No. 50-2).

## IV.    PRELIMINARY APPROVAL OF THE SETTLEMENT

30.    Lead Plaintiff moved for preliminary approval of the Settlement on November 30, 2017 (Dkt. No. 50) and, following a hearing on January 3, 2018, and reviewing and, along with counsel for Defendants, commenting on certain edits made by the Court to the Notice Order,

Notice, Summary Notice, and Proof of Claim on January 11, 2018 (Dkt. No. 56), the Court entered

the Notice Order on January 12, 2018 (Dkt. No. 55).   The Notice Order: (1) found that the

Stipulation was sufficiently fair, reasonable, and adequate as to warrant providing Notice of the

Settlement to Class Members; (2) directed Notice to the Class Members; (3) preliminarily certified,

for the purposes of effectuating the Settlement, the Class pursuant to Rule 23 of the Federal Rules

of Civil Procedure; and (4) set a schedule in connection with settlement-related proceedings,

including the scheduling of a final settlement approval hearing for April 30, 2018, at 2:45 p.m.

*See* Dkt. No. 55.

## V.    SUMMARY OF THE SETTLEMENT AND PLAN OF ALLOCATION

31.    The Settlement Fund is valued at $1,325,000.00.   This Settlement Fund will be

distributed to Class Members on a *pro rata* basis pursuant to a Plan of Allocation formulated by

Lead Counsel with the assistance of a damages consultant, with the goal of reimbursing Class

Members in a fair and reasonable manner.

32.    The Settlement represents approximately 6.8% of the estimated damages for all

Class Members—damages that would be recoverable only if: Lead Plaintiff survived a motion to

dismiss for failure to meet the ultra-heightened pleading standards of the PSLRA; a class was

certified and class certification survived through trial(s) and appeal(s); Lead Plaintiff persuaded a

jury that investor losses from the drop alleged in the Complaint was a result of the revelation of

the truth about Defendants' alleged misrepresentations; Lead Plaintiff persuaded a jury to accept

Lead Plaintiff's methodology concerning the number of injured shares; and Lead Plaintiff

otherwise prevailed on his claims through summary judgment, trial(s), and appeal(s).

33.    The percentage of recovery in proportion to the maximum estimated recoverable

damages is in line with the average approved securities class action settlement.   According to a

recent Cornerstone Research study, it was found that the median recovery as a percentage of estimated damages in all securities class action settlements was just 2.5% during 2006-2015 and only 1.8% in 2015.  *See* Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons, Securities Class Action Settlements: 2015 Review and Analysis (Cornerstone Research 2016) (Ex. 3 hereto) at 9, Figure 8.

34.     The Class consists of all Persons who purchased or otherwise acquired Avid securities between August 4, 2016 and November 9, 2016, inclusive, and who were damaged thereby.  As noted above, the Net Settlement Fund is to be distributed on a *pro rata* basis pursuant to a Plan of Allocation to those Class Members that submitted valid claims (the "Authorized Claimants"). As set forth in the Notice, the Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim."

35.     Lead Counsel developed a proposed Plan of Allocation, with the assistance of Lead Plaintiff's damages consultant, that provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members who submit valid Claim Forms.   Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Avid publicly traded common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of Recognized Loss Amounts is generally based on the difference between the amount of estimated alleged artificial inflation in Avid common stock on the date the stock was purchased and the amount of estimated alleged artificial inflation on the date of sale.  The sum of the Recognized Loss Amounts for all of a Claimant's purchases or acquisitions of Avid common stock during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized

Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

36.     The proposed Plan of Allocation is based on the premise that the decrease in the price of Avid's securities occurring upon the revelation of the truth about Defendants' alleged misrepresentations to the investing public may be used to measure the alleged artificial inflation in the price of Avid's securities prior to such revelations.  Lead Counsel submits that the Plan of Allocation fairly and rationally allocates the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in Avid common stock attributable to the conduct alleged.  Moreover, the Plan of Allocation is set forth in the Notice, and to date, no objections to the Plan have been received from any Class Members.

## VI.     NOTICE OF SETTLEMENT

37.     Lead Counsel, through the Claims Administrator, implemented a comprehensive notice program whereby notice was given to the members of the Class by mail and by publication. The Notice contained, *inter alia*, the following information necessary to evaluate the benefits of the Settlement to the Class Members: (1) the amount and makeup of the Settlement Fund; (2) the Plan of Allocation; (3) that Lead Counsel would apply for a fee award up to an amount not to exceed thirty-three and one-third percent (33.33%) of the Gross Settlement Fund, as well as expenses incurred prosecuting this Action up to $75,000.00, with interest on both amounts, and that Lead Plaintiff would see a compensatory award of up to $10,000.00 pursuant to 15 U.S.C. §78u-4(a)(4); (4) that any Class Member could object to the Settlement and/or fee and expense application or seek exclusion from the Class; (5) a detailed explanation of the reasons for the Settlement; (6) that the deadline for requesting exclusion from the Settlement is April 9, 2018; (7) that objections to the Settlement, the Plan of Allocation or the fee application must be filed no later than April 9, 2018; (8) the date, time, and location of the Final Approval Hearing and that Class

Members have the right to attend and be heard; and (9) that the deadline for filing Proofs of Claim is April 19, 2018.

38.     To provide actual notice to the Class, the Claims Administrator mailed, by first class mail, postage prepaid, the Notice and Claim Form approved by the Court to all individuals and organizations identified on the records of Avid's transfer agent. These records reflect persons and entities that purchased the common stock of Avid for their own account or for the account(s) of their clients during the Class Period.  A letter was also mailed to all brokerage companies, banks, and trust companies contained on the Claims Administrator's master mailing list notifying them of the settlement and asking them to within ten (10) calendar days from the date of the letter, to either send the Notice and Claim Form to beneficial owners or provide the Claims Administrator with a list of names and addresses of such beneficial owners so that the Claims Administrator could promptly mail the Notice and Claim Forms directly to them.  Bareither Decl. at ¶7.

39.     In addition, Lead Plaintiff caused the Summary Notice to be published in *IBD Weekly* and transmitted over PR Newswire, a national newswire service.  *Id.* at ¶12.  Copies of the Notice Packet and Stipulation of Settlement were made available on the website maintained by the Claims Administrator, at www.AvidSecuritiesSettlement.com.  *Id.* at ¶14.  In addition, the Claims Administrator maintained a toll-free telephone number to accommodate inquiries from potential Class Members.  *Id.* at ¶13.

## VII.    THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT

### A.    The Risks of Continued Litigation Support the Settlement

40.     Before representing to the Court that the Settlement is fair, reasonable, and adequate, Lead Counsel, experienced securities class action attorneys, evaluated the prospects of obtaining a better result at trial—one that would also have to withstand later attack on appeal.

- 15 -

Lead Counsel carefully evaluated the merits of this case, in light of all of the risks and potential weaknesses, before Lead Plaintiff entered into the Settlement.   With the advisement of Lead Counsel, and cognizant of its role as fiduciary to the Class, Lead Plaintiff—while continuing to believe in the merits of this Action—has taken into account the substantial risk posed to the Class in continuing this Class Action.   In particular, Lead Plaintiff recognizes that this Class Action might be dismissed on the pleadings, might not be certified for treatment as a class action, or might succumb at the summary judgment stage to attacks regarding loss causation, scienter, liability, or damages.

41.     In addition to the general risks of any litigation, a heightened level of risk existed because this Action is subject to the provisions of the PSLRA, 15 U.S.C. §78u-4, which makes it more difficult for investors to successfully prosecute securities class actions. The claims in this Class Action under Sections 10(b) and 20(a) of the Exchange Act, were brought on the theory that Defendants intentionally or recklessly misrepresented to investors facts concerning, *inter alia*, Avid's products, pipeline, and financial results.  Even if the Complaint had survived Defendants' Motion to Dismiss, each element of this claim would have been hotly contested.

42.     For example, obtaining a favorable jury finding on the element of scienter is hardly a foregone conclusion.  Lead Plaintiff would have to show that Defendants misrepresented Avid's financial status recklessly or with knowledge that investors could be deceived.   Proof of such scienter likely would have to be based upon circumstantial evidence.   While the circumstances surrounding Defendants' representations with respect to Avid's business were alleged to strongly suggest scienter, Lead Plaintiff and Lead Counsel are aware of the challenges of proving it.

43.     Also difficult would be proving that the Class suffered damages as a result of Defendants' misconduct.  Defendants likely would have argued that the drops in stock price were

not, as Lead Plaintiff alleges, realizations of the truth which had been withheld from investors, but rather were caused by independent forces.

44.     Lead Plaintiff also faced challenges to maintain this case as a class action.  In any securities fraud class action, the plaintiff faces significant challenges to certifying a class and maintaining class action status throughout trial.  Pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to obtain class certification, Lead Plaintiff would need to prove that Avid's shares traded in an efficient market during the Class Period, such that new, material information was rapidly incorporated into Avid's share price. If Avid's share price thus reflected Defendants' misstatements, purchasing shares at market price would be considered a proxy for actual reliance, and that element of the Section 10(b) claim could thus be proved class-wide.  In order demonstrate market efficiency, however, Lead Plaintiff would have to rely on expert testimony.

45.     Of course, Defendants likely would have contested that the market for Avid stock was efficient, presented expert testimony of their own in support of their opposition to class certification, and may have even moved to strike the testimony of Lead Plaintiff's expert(s).  While Lead Plaintiff and Lead Counsel believe that certification of a non-settlement class would be appropriate in this case, and while conditional certification was granted by the Court in conjunction with preliminary approval of the Settlement, certification of this Class Action through trial was not guaranteed.  Accordingly, the risks of certifying the Action as a class action and maintaining the Class throughout the litigation support approval of the Settlement.

46.     Regardless of the ultimate outcome, there is no question that further litigation would be expensive and complex.  The claims at the heart of this case involved technical issues with respect to Avid's products, financial forecasting, accounting practices, and issues of stock manipulation and efficiency, proof of which would require costly and complex financial and

accounting expertise.  For class certification, Lead Plaintiff would have to procure an expert's declaration on the issue of market efficiency (as would have Defendants).  In addition to full briefing, voluminous documents would have been produced, and expert depositions would have been taken.

47.     With respect to discovery, Lead Counsel would anticipate, given the complexities of the issues involved in this Action, reviewing potentially millions of pages of documents and taking many depositions, including depositions of Avid's customers, employee personnel, and current and former senior executive officers.  Following the close of merits discovery, the Parties would have engaged in expert discovery.  Lead Counsel, on behalf of Lead Plaintiff and the Class, would have to procure expensive and complex expert testimony to prove loss causation and damages.  Defendants would present their own expert testimony to demonstrate that any alleged stock drops were not proximately caused by the revelation of the fraud, and/or attempt to demonstrate that at least a portion of the alleged stock drops were attributable to other things unrelated to revelation of the fraud.

48.     Thus, the likely duration and expense of further litigation also supports a finding that the Settlement is fair, reasonable, and adequate.  Even if a class had been certified and the Complaint survived Defendants' likely motions to dismiss and motions for summary judgment, continued prosecution of this Action would be complex, expensive, and lengthy, with a more favorable outcome than the Settlement highly uncertain.  After trial, any appeal would have to be resolved by the First Circuit.  Thus, the present value of a certain recovery at this time, as opposed to the mere chance for a greater one down the road, supports approval of a settlement that eliminates the expense and delay of continued litigation, as well as the risk that the Class could receive no recovery.

49.     At this point, over fifteen months into this Action, Lead Plaintiff is aware of the strengths and weaknesses of his case, all of which were brought into sharper focus while briefing Defendants' Motion to Dismiss, preparing for and attending the mediation, and negotiating the Settlement.  In sum, despite Lead Counsel's confidence in the strength of Lead Plaintiff's case, the risk, expense, complexity, and likely duration of further litigation strongly support approval of the Settlement.

### B.     The Amount Offered Supports the Settlement

50.     The Settlement value, totaling $1,325,000.00 in cash, constitutes approximately 6.8% of Lead Plaintiff's estimated damages, which exceeds a recent Cornerstone Research study which found that the median recovery (as a percentage of estimate damages) in all securities class action settlements was 2.5% during 2006-2015, and only 1.8% in 2015.  As such, this Settlement is an objectively good recovery and well within the range of fairness.  Indeed, settlements valued at a much lower percentage of possible damages are routinely approved.

51.     Moreover, the estimated recovery of 6.8% of estimated Class Period damages does not take into account the various defenses put forth by Defendants. If a jury chooses to credit Defendants' damages and loss causation experts over Lead Plaintiff's experts, in whole or in part, with respect to whether a significant portion of either or both of the alleged share price declines were causally related to Defendants' alleged misrepresentations and omissions, damages could substantially be reduced or eliminated.

52.     Finally, when compared with the present value of the damages Lead Plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing, the Settlement reached in this case is even more valuable.  Thus, where the trial of this Action would be a long,

arduous process requiring great expenditures of time and money on behalf of both the Parties and the Court, the recovery of a substantial sum certain today weighs in favor of the Settlement.

### C.  Lead Counsel's Investigation Supports the Settlement

53.   Lead Counsel conducted an extensive investigation in this Action, providing them with unique insight to be able to evaluate the fairness of the Settlement.  Indeed, Lead Plaintiff and Lead Counsel conducted an extensive factual and legal analysis of this Action by, *inter alia*, (1) reviewing and analyzing Avid's Class Period and pre-Class Period public filings, annual reports, press releases, quarterly earnings call and investment conference transcripts, and other public statements; (2) collecting and reviewing a comprehensive compilation of analyst reports and major financial news service reports on Avid; (3) reviewing and analyzing stock trading data relating to Avid; (4) retaining an investigator to locate and interview witnesses; (5) reviewing Lead Plaintiff's qualifications to serve as a class representative; (6) researching and analyzing publicly-available materials, both specifically related to Avid's products and services, and more generally related to the digital media content production, management, and distribution industry; (7) researching and analyzing publicly-available materials relating to previous allegations against Avid for violations of the federal securities laws; (8) drafting the initial complaint and the Complaint; (9) consulting with economic experts; (10) preparing for and participating in a full-day mediation process with a nationally regarded third-party neutral, Mr. Melnick, including drafting a detailed mediation statement and preparing rebuttals to Defendants' mediation statement, obtaining a very favorable settlement offer following arm's-length negotiations with defense counsel, and participating in continued negotiation efforts for several weeks following the mediation to achieve and finalize the Settlement; and (11) preparing the Settlement, motion papers, and related documents necessary to

provide notice of the Settlement to Class Members and to obtain preliminary approval and prepare the necessary documents in an effort to secure final approval of the Settlement.

54.     As such, this extensive pre-filing, prosecution, and settlement period investigation has given Lead Counsel unique insight to evaluate the fairness, reasonableness, and adequacy of the Settlement in view of the risks of continued litigation.

**D.     The Settlement Was Negotiated at Arm's-Length by Experienced Counsel with a Nationally-Respected Mediator**

55.     Lead Counsel in the Action is experienced and well-respected, and specializes in the area of securities and shareholder litigation.  In addition, the Settlement was achieved with the aid of a nationally-regarded mediator, Mr. Melnick.  The Settling Parties engaged in negotiation during an all-day mediation with Mr. Melnick.  The negotiations were in good faith, at arm's-length and were in no way collusive.  After a day of spirited discussion and back-and-forth bargaining, and continued negotiation with the aid of Mr. Melnick over the ensuing weeks, the Settling Parties agreed to resolve the Action.

56.     Without breaching mediation confidentiality, Mr. Melnick has confirmed that negotiations were "hard-fought" and arm's-length, and that the Settlement "is a reasonable resolution of the Action for the Parties based on [Mr. Melnick's] involvement in the negotiations, review and analysis of the Parties' mediation submissions, extensive communications with the Parties, and assessment of the risks inherent in continuing the litigation of the Action, and the limited potential damages."  *See* Melnick Decl. at ¶¶2-7.  After the Settlement in principle was reached several weeks after the mediation, the Settling Parties engaged in further negotiations over the details of the Stipulation and the other facets of the Settlement and its documentation.  Only after several weeks of additional negotiations, and substantial effort in drafting all of the Settlement-related documentation and necessary filings, did the Settling Parties finally agree to all

the terms of the Settlement reflected in the Stipulation.  That this Action was hard-fought at every stage by experienced counsel, and the Settlement was overseen by a reputable, experienced mediator in Mr. Melnick, strongly weighs in favor of a finding that the Settlement is fair, reasonable, and should be approved.

###### E.    The Reaction of Class Members Supports the Settlement

57.    Pursuant to the Court's Notice Order, the Claims Administrator has now delivered over 7,388 Notice Packets to potential Class Members.  *See* Bareither Decl. at ¶11.  The Summary Notice was also published in *IBD Weekly* and disseminated over PR Newswire, a national newswire service, and the Notice was posted on the Claims Administrator's website at www.AvidSecuritiesSettlement.com.  *Id.* at ¶¶12, 14.   The Notice advised potential Class Members of, among other things: (i) the terms of the Settlement; (ii) their right to exclude themselves from the Class; (iii) the manner for submitting a Proof of Claim in order to be eligible for a payment from the Settlement Fund; (iv) the request for an award of attorneys' fees and expenses; (v) Lead Plaintiff's request for a compensatory award pursuant to 15 U.S.C. §78u-4(a)(4); and (vi) their right to object to any aspect of the Settlement, including the Plan of Allocation, award of attorneys' fees and expenses, and Lead Plaintiff's request for a compensatory award pursuant to 15 U.S.C. §78u-4(a)(4).  While the deadline for Class members to object to the Settlement and Plan of Allocation has not yet passed, to date there have been no objections to any aspect of the settlement and no requests for exclusion from the Class have been received.  *Id.* at ¶15.[5]

---

[5]  The objection deadline is April 9, 2018.  If any timely objections are received, Lead Counsel will address them in a reply memorandum due no later than April 23, 2018.

## VIII.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES

58.     As compensation for its efforts, Lead Counsel is applying for an award of attorneys' fees in the amount of 33 1/3% of the Settlement Fund and reimbursement of $55,542.50 in total expenses reasonably incurred in the prosecution and settlement of the Action.  Lead Counsel has prosecuted this Action for more than fifteen months without any compensation, and Lead Counsel has incurred tens of thousands of dollars in expenses without any guarantee of success.

59.     The fee request is within the range of fees awarded by courts in the First Circuit, as further detailed and discussed in Lead Counsel's concurrently filed Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Expenses, and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee and Expense Brief").

60.     As discussed in the Fee and Expense Brief, the request of 33 1/3% of the Settlement Fund in this case is within the range of fees awarded by numerous courts in this District as well as in other courts both within the First Circuit and throughout the country, on settlement amounts that are on par with the Settlement achieved in this Action.  *See, e.g.*, *Lauture v. A.C. Moore Arts & Crafts, Inc.*, No. 17-cv-10219, 2017 U.S. Dist. LEXIS 195147, at *3 (D. Mass. Nov. 28, 2017) (Dein, J.) (finding one-third fee award of $2.9 million settlement "appropriate because it mimics the market" and declining to perform a lodestar cross-check); *Roberts v. TJX Cos.*, No. 13-cv-13142-ADB, 2016 U.S. Dist. LEXIS 136987, at *45 (D. Mass Sep. 30, 2016) (Burroughs, J.) (finding fee award of one-third of the fund recovered, including a lodestar multiplier of nearly 2, to be "reasonable in light of the counsel's efforts—consolidating the three class actions, preparing for mediation, engaging in extensive settlement negotiations, undertaking a substantial amount of work in approving the settlement, administering the required notice to class members, and administering the settlement itself—and the significant risk they assumed in taking the case on a

wholly contingent basis, to be reasonable."); *Lapan v. Dick's Sporting Goods*, No. 13-cv-11390-RGS, Dkt. Nos. 220-21 (D. Mass. April 19, 2016) (Stearns, J.) (approving thirty-three and one-third percent of $3.3 million settlement); *Barbosa v. Publishers Circulation Fulfillment, Inc.*, No. 08-cv-10873 (D. Mass. Nov. 25, 2009) (Dein, J.) (approving one-third fee award of $1.4 million settlement fund); *Swack v. Credit Suisse First Bos., LLC*, No. 1:02-cv-11943-DPW, Dkt. No. 114 (D. Mass. Jul. 18, 2006) (Woodlock, J.) (33%); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-82 (D. Mass. 2005) (awarding 33.3% of $75 million settlement fund; 2.02 multiplier of counsel's lodestar); *In re StockerYale, Inc. Sec. Litig.*, No. 1:05-cv-00177-SM, 2007 U.S. Dist. LEXIS 94004, at *21 (D.N.H. Dec. 18, 2007) (awarding 33.3% of $3.4 million settlement; 2.17 multiplier); *City of Providence v. Aéropostale, Inc., No. 11 Civ. 7132,* 2014 U.S. Dist. LEXIS 64517, at *33, *60 (S.D.N.Y. May 9, 2014) (awarding fees of 33% of $15 million settlement where maximum damages were $163 million); *Maley v. Del Global Techs. Corp.,*186 F. Supp. 2d 358, 374 (S.D.N.Y Jan. 29, 2002) (awarding 33.3% of settlement fund valued at over $11.5 million).

61.     As discussed in the Fee and Expense Brief and below, each of the factors considered by courts in the First Circuit confirm the reasonableness of the fee request.

### A.     Counsel Achieved An Excellent Result for the Class

62.     Courts have consistently recognized that the result achieved is an important factor to be considered in making a fee award.  The Settlement Fund created here consists of $1,325,000.00 cash.  This amount, representing approximately 6.8% of the estimated potential damages, is a very good recovery for the Class.  The results achieved by Lead Counsel in a legally and factually complex case justify the requested fee award.

B.     **The Risk of Litigation**

63.     As endorsed by the First Circuit, the risk of litigation is an important, if not the foremost, factor in awarding attorneys' fees.  As is detailed *infra* at ¶¶40-49, continued prosecution of the Action was indeed risky.

64.     Notably, and despite such risks, this Action settled for 6.8% of the Class Period damages *before* Lead Plaintiff had demonstrated that the Complaint was well-pleaded under the PSLRA, proved that Avid stock traded in an efficient market (a prerequisite for class certification), and *before* Lead Plaintiff demonstrated (either on summary judgment or at trial) the amount of Avid's share price decline attributable to the revelation of the truth about Defendants' alleged misrepresentations to the investing public resulted in a decline in the price of Avid common stock. In sum, the obstacles to recovery faced by the Class in this securities class action were significant, particularly given the strict pleading requirements of the PSLRA and applicable proof requirements during the later stages of the case (and on appeal).

C.     **The Skill Required and the Quality and Efficiency of the Work**

65.     The "prosecution and management of a complex national class action requires unique legal skills and abilities."  *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 U.S. Dist. LEXIS 11149, at *16 (N.D. Cal. Feb. 2, 2009) (internal citations omitted).  Here, the quality of Lead Counsel's work on this case is reflected in the recovery obtained.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 U.S. Dist. LEXIS 119702, at *28 (S.D.N.Y. Nov. 8, 2010); *In re Bisys Sec. Litig.*, No. 04 Civ. 3840 (JSR), 2007 U.S. Dist. LEXIS 51087, at *3 (S.D.N.Y. July 16, 2007).

66.     As reflected in Lead Counsel's firm résumé, which attached as Exhibit C to the Declaration of Michael I. Fistel, Jr. of Johnson Fistel, LLP in Support of Lead Counsel's Motion

for an Award of Attorneys' Fees, Payment of Expenses, and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) (Ex. 4 hereto) ("Johnson Fistel Decl."), Lead Counsel has extensive and significant experience in the highly-specialized field of securities class action and shareholder litigation.  Given the complexity of the issues presented in this Action, including the issues of market efficiency, loss causation, scienter, and damages, only skilled counsel who applied themselves diligently could have obtained such a favorable recovery.  Specifically, Lead Counsel were required to: grasp and explain the Company's product offerings; review the Company's accounting concepts applicable to Avid's financial statements and financial forecasting; evaluate evidence demonstrating that Avid's shares traded in an efficient market; evaluate evidence demonstrating loss causation; and probe extremely complex issues regarding the pleading and proof of falsity and scienter.

67.     The quality of opposing counsel is also important in evaluating the quality of the work done by Lead Counsel.  Here, Lead Plaintiff and Lead Counsel were vigorously opposed by Ropes & Gray LLP, a prominent national law firm that frequently defends public companies in securities class actions.

68.     In sum, Lead Counsel were required to perform with a high level of skill, efficiency, and professionalism to assemble a case that was strong enough to encourage the Company to compensate Class Members for their losses.  Lead Counsel evaluated the merits and risks presented, negotiated a very favorable payment, and settled this Action on excellent terms for Class Members.  Melnick Decl. at ¶2 ("From a mediator's perspective, however, I recommend the proposed Settlement as reasonable, arm's length, and consistent with the risks and potential rewards of the claims asserted in the Action."); ¶7 ("I believe the proposed $1,325,000.00 settlement is a reasonable resolution of the Action for the Parties based on my involvement in the

negotiations, review and analysis of the Parties' mediation submissions, extensive communications with the Parties, and assessment of the risks inherent in continuing the litigation of the Action, and the limited potential damages."). Lead Counsel's efforts, efficiency, and dedication should be rewarded.

### D. The Contingent Nature of the Case and the Financial Burden Carried by Lead Counsel

69.     The First Circuit recognizes that the determination of a fair fee must include consideration of the contingent nature of the fee and the difficulties which were overcome in obtaining the Settlement. In fact, contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless of whether they win or lose.

70.     As discussed *infra* at ¶74, the fee requested by Lead Counsel is *less than* the market value of the time it has spent litigating this case. Moreover, Lead Counsel received no compensation over the year that this Action has been pending and incurred significant litigation expenses for the benefit of the Class. Any fee award or expense reimbursement to Lead Counsel has always been at risk and completely contingent on the result achieved, and on this Court's exercise of its discretion in making any award. Thus, this factor militates in favor of the Court granting Lead Counsel's request for attorneys' fees and expenses.

### E.      The Customary Fee

71.     If this were not a class action, the customary fee arrangement would be contingent, on a percentage basis. Because the percentage-of-recovery fee requested in this case approximates the customary contingent fee in the private marketplace —33 1/3% of the fund recovered—Lead Counsel's request is reasonable. *See, e.g.*, *Lauture*, 2017 U.S. Dist. LEXIS 195147, at *3 (finding

one-third fee award of $2.9 million settlement "appropriate because it mimics the market" and declining to perform a lodestar cross-check); *see also infra* at ¶60.

72.     Under these circumstances, a fee award of a reasonable percentage fee of 33 1/3% of the Settlement (plus expenses) reflects both the benefit conferred and approximates the customary, privately-contracted contingent fee rate.

### F.     A Lodestar Cross-Check Shows the Fee Request Is Reasonable

73.     As a "cross-check" on the reasonableness of a requested fee award, courts often compare counsel's "lodestar" (a compilation of the hours performed at the various rates charged for the professionals providing the services herein) with the fee request made under the percentage-of-the-fund method.

74.     Significantly, in securities class actions, it is common for lodestar figures to be adjusted upward by a multiplier to reflect a variety of factors, including the complexity of the case and the risks assumed by counsel.  Here, the lodestar cross-check confirms that the fee requested by Lead Counsel is fair and reasonable.  To date, Plaintiffs' Counsel have spent 1,134.6 total hours of professional time, having a market value of $627,452.50, in prosecuting this Action.[6]  Based on the current cash value of the Settlement Fund of approximately $1,325,000.00, the requested 33 1/3% fee is $441,666.67.  Thus, the requested fee of $441,666.67 is *less than* the fair value of the time Lead Counsel has spent litigating this case, *yielding a negative multiplier* of approximately

---

[6] Specifically, through February 11, 2018, Lead Counsel Johnson Fistel, LLP devoted 1,094.4 hours of professional time to the Action, for a total lodestar of $605,352.50.  *See* Johnson Fistel Dec. at ¶5 and Ex. A.  Hutchings Barsamian Mandelcorn, LLP serving as Liaison Counsel, has spent 40.2 hours on the litigation for a total lodestar of $22,100.00.  *See* Declaration of Theodore M. Hess-Mahan, Esq., Of Counsel to Hutchings Barsamian Mandelcorn, LLP, in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Expenses, and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) (Ex. 5 hereto) ("Hutchings Decl.") at ¶5 and Ex. A.

0.7039.  This "negative multiplier" is extremely unusual and supports the reasonableness of the fee requested.

> ### G.     The Reaction of the Class Supports the Requested Award

75.     Class Members were informed in the Notice and the Summary Notice that Lead Counsel could apply for attorneys' fees of up to 33 1/3% of the Settlement Fund, plus reimbursement of litigation costs and expenses (not to exceed $75,000), with interest on both amounts, and were advised of their right to object to Lead Counsel's fee and expense request.  To date, no objections to the fee request or any aspect of the Settlement have been filed with the Court, nor has any objection been received by the Claims Administrator, Lead Counsel, or Defendants' Counsel.

## IX.     LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF EXPENSES

76.     The Court should likewise approve Lead Counsel's request for reimbursement of expenses.  Courts have found that counsel for the Class are entitled to reimbursement for certain types of out-of-pocket expenses that an attorney would normally expect the client to pay.

77.     To prosecute this Action to Settlement, Plaintiff's Counsel incurred reasonable and necessary costs and expenses in the amount of $55,542.50.[7]  These expenses were incurred largely in conjunction with mediation fees and the engagement of an investigator and damages consultant.  Thus, Lead Counsel seeks reimbursement of these costs and expenses related to the prosecution of this Action on behalf of the Class.  Additionally, because the expenses at issue are the types

---

[7] Specifically, Lead Counsel Johnson Fistel, LLP incurred total expenses of $55,255.18.  *See* Exhibit 4 hereto, Johnson Fistel Decl. at ¶¶7-8, and at Ex. B.  Hutchings Barsamian Mandelcorn, LLP, serving as Liaison Counsel, incurred total expenses of $287.32.  *See* Exhibit 5 hereto, Hutchings Decl. at ¶¶6-7, and at Ex. B.

reimbursed by individual clients in the marketplace, they should be reimbursed from the common fund.

78.     Because the expenses were incurred with no guarantee of recovery, Lead Counsel had a strong incentive to keep them as low as reasonably possible—and did so.  Indeed, total expenses of $55,542.50 are significantly less than the $75,000 estimate contained in the Notice. Moreover, the fact that no Class Members objected to the reimbursement of Lead Counsel's estimated expenses further evidences their reasonableness.

79.     Since the expenses here are relatively small compared to the recovery obtained, and were incurred on an ongoing basis for such items as consultant fees, investigation, mediation, legal research and other expenses necessarily incurred and directly related to the prosecution of this Action, the total amount of expenses is reasonable and should be reimbursed in full from the common fund following payment of attorneys' fees.

## X.     LEAD PLAINTIFF'S REQUEST FOR A COMPENSATORY AWARD PURSUANT TO 15 U.S.C. § 78u-4(a)(4)

80.     During the course of this litigation, Lead Plaintiff spent 101.65 hours performing significant work for the benefit of the Class as court-appointed Lead Plaintiff.  *See* Declaration of David Wayne Hammond in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and For an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) (Ex. 6 hereto) ("Hammond Decl.") at ¶9.

81.     Lead Plaintiff was actively involved in this case from start to finish.  For example, Lead Plaintiff engaged in at least 50 telephonic conferences and other correspondence with Lead Counsel, which allowed Lead Plaintiff to be kept fully informed regarding case status.  *Id.* at ¶3. Lead Plaintiff also (a) personally conducted significant research on securities class actions and related topics relevant to his role as Lead Plaintiff; (b) participated in regular telephone conferences

and meetings with Lead Counsel concerning the significant developments in the litigation; (c) communicated frequently with, and received periodic status updates from, Lead Counsel regarding the status of the case; and (d) participated in discussions with Lead Counsel concerning settlement negotiations with Defendants and the ultimate decision to agree to the Settlement to resolve the Action. *Id.*

82.     Lead Plaintiff also reviewed all of the pleadings, briefs, and orders in the Action. *Id.* at ¶4.  These documents included: (a) the initial complaint filed in this Action; (b) briefing and submissions relating to Lead Plaintiff's motion for appointment as Lead Plaintiff in the Action, and the order appointing Lead Plaintiff as Lead Plaintiff in this Action; (c) the operative, amended Complaint; (d) briefing related to Defendants' motion to dismiss; (e) mediation submissions; (f) drafts of the Stipulation, and exhibits thereto; and (g) the Order granting the motion for preliminary approval of the Settlement of the Action. *Id.*  In connection with each of these documents, Lead Plaintiff communicated with Lead Counsel regarding their potential impact on the Action. *Id.*

83.     Lead Plaintiff also participated in discussions with Lead Counsel concerning negotiations with Defendants and the ultimate decision to settle this Action.  Lead Plaintiff also carefully reviewed, considered, and ultimately approved the proposed Settlement. *Id.* at ¶5.

84.     In recognition of Lead Plaintiff's time and effort expended for the benefit of the Class, Lead Counsel respectfully requests a compensatory award to Lead Plaintiff in the amount of $7,940.90, which represents his time spent in the prosecution of this Action multiplied by an hourly rate of $78.12, a rate based on his annual income as a Program Manager for a leading global security company in the Boston-metro area. *Id.* at 9.

## XI.     CONCLUSION

85.     Lead Counsel respectfully submits that, based on an understanding of the

circumstances concerning the subject matter of this Action, the principles of law applicable to them, the procedural posture of this Action, and the risks of continued litigation against the Defendants, the Settlement represents a very good, reasonable result for the Class and should be approved by the Court.

86.     Based on these factors, as well as Lead Counsel's extensive experience in litigating securities class actions, Lead Counsel believes that the Settlement, which provides a certain recovery to the Class, is more beneficial than continuing to prosecute the action towards an uncertain outcome.

87.     Lead Counsel respectfully submits that the Settlement and Plan of Allocation are reasonable in light of the criteria considered by courts in this Circuit.  Therefore, Lead Plaintiff and Lead Counsel request that the Court approve the Settlement and Plan of Allocation, find that notice to the Class satisfied due process, grant final certification of the Class for settlement purposes, award attorneys' fees equal to 33 1/3% of the Settlement Fund and reasonable expenses to Plaintiffs' Counsel in the amount of $55,542.50, and grant a compensatory award to Lead Plaintiff pursuant to 15 U.S.C. § 78u- 4(a)(4) in the amount of $7,940.90.

## XII.   INDEX OF EXHIBITS

Attached hereto are the following exhibits:

- **Exhibit 1**: Declaration of Jed D. Melnick Esq. in Support of Final Approval of Class Action Settlement;

- **Exhibit 2**: Declaration of Jennifer M. Bareither Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date, with exhibits;

- **Exhibit 3**: a true and correct copy of Laarni T. Bulan, Glen M. Ryan, and Laura E. Simmons, Securities Class Action Settlements: 2015 Review and Analysis (Cornerstone Research 2016);

- **Exhibit 4**: Declaration of Michael I. Fistel, Jr. of Johnson Fistel, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Expenses, and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4), with exhibits;

- **Exhibit 5**:   Declaration of Theodore M. Hess-Mahan of Hutchings Barsamian Mandelcorn, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Expenses, and an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4), with exhibits;

- **Exhibit 6**: Declaration of David Wayne Hammond in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and For an Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4); and

- **Exhibit 7**:  a true and correct copy of the article entitled "Legal Fees Cross New Mark: $1,500 an Hour," by Sara Randazzo and Jacqueline Palank, February 9, 2016, *The Wall Street Journal.*

I declare under penalty of perjury that the above statements are true and correct.

Executed on this the 23rd day of February, 2018.

_____
MICHAEL I. FISTEL, JR.

Respectfully submitted,

DATED:  February 23, 2018

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.

_s/ Michael I. Fistel, Jr._
MICHAEL I. FISTEL, JR.

Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
michaelf@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
600 W Broadway, Suite 1540
San Diego, CA, 92101
Telephone: 619/230-0063
Facsimile: (619) 255-1856
frankj@johnsonfistel.com

_Lead Counsel for Lead Plaintiff_

**HUTCHINGS BARSAMIAN**
  **MANDELCORN, LLP**
THEODORE M. HESS-MAHAN
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
thess-mahan@hutchingsbarsamian.com

_Liaison Counsel for Lead Plaintiff_

- 34 -

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 23, 2018.

s/ *Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.

JOHNSON FISTEL, LLP
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
michaelf@johnsonfistel.com
